[No. H032987. Sixth Dist. Aug. 20, 2009.]

MARTIN DEAN MIYAMOTO, Plaintiff and Respondent, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Appellant.

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Alicia Fowler, Assistant Attorney General, Miguel A. Neri, Fiel D. Tigno and Robert Andrew Harkness, Deputy Attorneys General, for Defendant and Appellant.

Stephanie Francone and Andrew C. Janecki for Plaintiff and Respondent.

## OPINION

**McADAMS, J.**—The Department of Motor Vehicles (DMV) appeals a judgment granting Martin Dean Miyamoto's petition for writ of administrative mandamus and ordering the DMV to set aside its order suspending Miyamoto's driver's license after he was arrested for driving under the influence of alcohol. The trial court ruled that the forensic laboratory report (Lab Report) of Miyamoto's blood test results was inadmissible hearsay and that the Lab Report failed to meet the requirements of the public employee records exception to the hearsay rule (Evid. Code, § 1280)[1] because the DMV did not establish that the Lab Report was prepared at or near the time of the analysis of Miyamoto's blood sample.

The DMV argues that the trial court erred when it concluded that the Lab Report was inadmissible hearsay and asserts that, as a matter of law, the Lab

---

[1] All further statutory references are to the Evidence Code unless otherwise stated.

Report was admissible under section 1280 because the Lab Report states that the test results were recorded at the time of the analysis. The DMV also contends that the court erred in finding in favor of Miyamoto because Miyamoto, not the DMV, had the burden of proof in the trial court. We conclude that the Lab Report was admissible under the public employee records exception to the hearsay rule and reverse the judgment of the trial court. Consequently, we need not reach the DMV's contention regarding the burden of proof.

FACTS

On March 16, 2007, Morgan Hill Police Officer R. Krewson observed Miyamoto's car speeding and using a left turn lane as a passing lane. When Officer Krewson stopped Miyamoto, he observed signs of intoxication. Miyamoto said that he had consumed two beers. After Miyamoto performed poorly on field sobriety tests, Officer Krewson arrested him for driving under the influence (Veh. Code, § 23152, subd. (a)) and transported him to the Morgan Hill Police Department, where Miyamoto submitted to a blood test. Officer Krewson suspended Miyamoto's driving privilege and Miyamoto surrendered his driver's license.

A police department phlebotomy technician obtained two blood samples from Miyamoto and sent them to the Santa Clara County Crime Laboratory (Lab) for analysis. The Lab analyzed one of the samples on Friday, March 23, 2007. According to the Lab Report, Miyamoto's blood-alcohol content was 0.16 percent, twice the legal limit (Veh. Code, § 23152, subd. (b)).

The Lab Report contained the following certification: "I, the undersigned certify under penalty of perjury that the above blood . . . analysis reported herein was performed during the regular course of my duties and is a true and correct representation of the results of my analysis. I further certify that I am a qualified . . . Forensic Alcohol Analyst (FAA) . . . employed by the Santa Clara County Crime Laboratory. The equipment used to perform the analysis was in proper working order at the time the analysis was performed and the recording of the analysis results was done at the time of the analysis. I further certify that the transfer of data for reporting purposes was performed electronically in accord with the laboratory's policies and procedures." The Lab Report was signed by "R. Desai, FAA." The signature line, which included a line for the analyst to enter the "Date of review/report," contained a handwritten date: "3/26/07." The Lab Report contained the name of the "reviewer," "Joyner." A box in the middle of the report indicated that the "Date Printed" was "4/26/2007."

PROCEDURAL HISTORY

I. *Administrative Per Se Hearing and Hearing Officer's Decision*

Miyamoto's administrative hearing was conducted on June 11, 2007. Miyamoto was represented by counsel, but did not personally attend the hearing. Neither party presented witnesses and there was no live testimony. At the hearing, Miyamoto's counsel stipulated that the arresting officer had reasonable cause to believe that Miyamoto was driving under the influence of alcohol and that Miyamoto was lawfully arrested. The only contested issue was whether Miyamoto was driving with a blood-alcohol content of 0.08 percent or more.

Without objection, the hearing officer received five documents into evidence on behalf of the DMV: (1) Officer Krewson's sworn report on a DMV DS 367 form, (2) Officer Krewson's unsworn report on Morgan Hill Police Department forms, (3) the suspension order, (4) the declaration of the phlebotomist who drew the blood samples, and (5) Miyamoto's driving record.

The DMV also moved the Lab Report into evidence. However, Miyamoto objected to the admission of the Lab Report on two grounds. First, he acknowledged that the Lab Report, although hearsay, would generally be admissible if it appears to be trustworthy and meets the requirements of section 1280, the public employee records exception to the hearsay rule. Miyamoto asserted that the Lab Report was untrustworthy (§ 1280, subd. (c)) because it was certified on March 26, 2007, "32" days before it was printed on April 26, 2007. Second, Miyamoto argued that the Lab Report was inadmissible because the Lab did not forward the report to the DMV within 15 days of the arrest as required by Vehicle Code section 23612, subdivision (g)(1).[2]

At the administrative hearing, Miyamoto introduced and then objected to the admission of a separate report of the blood test results, which his counsel referred to as the "Query Lab Case Report" (QLCR), on the ground that it was inadmissible hearsay because it was not prepared "at or near the time of" the testing (§ 1280, subd. (b)). As Miyamoto acknowledges on appeal, although the QLCR was marked for identification and there was argument regarding the QLCR at the administrative hearing, Miyamoto's counsel stated that she was not moving the QLCR into evidence.

The DMV hearing officer overruled Miyamoto's objections to the Lab Report, determined that the Lab Report was admissible, found that Miyamoto

---

[2] Although Miyamoto raised this issue in his petition for administrative mandamus, the court did not address it. The parties do not address this issue on appeal and it is not before us.

was driving with a blood-alcohol level of 0.08 percent or more, and upheld the suspension of Miyamoto's license. The hearing officer held that the Lab Report met the requirements of section 1280 because the "results clearly state the recording of the analysis results was done at the time of the analysis."

## II.  *Petition for Writ of Mandate in the Superior Court*

Miyamoto petitioned the superior court for a writ of mandate to set aside the suspension order. Miyamoto argued that the Lab Report was not admissible under the public employee records exception to the hearsay rule for two reasons. First, he asserted that the document was untrustworthy (§ 1280, subd. (c)) because although it was certified on March 26, 2007, it was not printed until April 26, 2007. Miyamoto argued that "[i]t is physically impossible for a person to sign a document which is not yet in existence." Second, Miyamoto argued that even if the Lab Report was prepared on March 26, 2007, it was not admissible under the public employee records exception because it was not prepared "at or near the time" of the testing (§ 1280, subd. (b)), which occurred on March 23, 2007.[3] He argued that since the Lab Report contained the only evidence of his blood-alcohol content and should have been excluded, there was insufficient evidence to support the hearing officer's finding that he was driving with a blood-alcohol content in excess of 0.08 percent.

The DMV opposed the petition, arguing that Miyamoto's contentions were "without merit because the lab report expressly states that the recording of the analysis results was done at the time the analysis was performed." The DMV argued that Miyamoto's contentions were based on a mistaken interpretation of the report and that March 26, 2007, was not the date the lab results were reported but the date they were reviewed by the "reviewer."

At the hearing, the court focused on the handwritten date on the Lab Report and stated that one way of interpreting the date is to find that the analyst prepared and signed the report on that date and that another way of interpreting the date is to conclude, as the DMV had argued, that the "reviewer" reviewed the report on that date. The court held that the Lab Report was "insufficient to meet the requirements of Evidence Code Section 1280, [subdivision] (b) because it does not establish that it was prepared at or near the time of the analysis and the entry of the data" and granted the writ petition. The court explained: "the fact that I have a report that's printed April 26, a month after the analysis is done, and I have . . . the analyst indicating the date of 3/26/07 as the date of his report, which is equally probable to the

---

[3] At the DMV hearing, Miyamoto made this argument with regard to the QLCR, not the Lab Report. However, the hearing officer's ruling on the admissibility of the Lab Report appears to include both of Miyamoto's contentions and the DMV does not argue waiver.

Department's position that the date was a date that indicated that the report was reviewed by Mr. Joiner [*sic*], or the data was reviewed by Mr. Joiner [*sic*]. I think given these are two equally probable propositions and that the department had the burden of proving the admissibility of this document, the document's not inherently trustworthy. It's insufficient to meet the requirements of Evidence Code Section 1280(b) because it does not establish that it was prepared at or near the time of the analysis and the entry of the data." The court granted the writ, ordered the DMV to set aside its order suspending Miyamoto's license, and awarded Miyamoto his costs of suit. The DMV appeals.

## DISCUSSION

The DMV argues that the trial court erred when it concluded that the Lab Report was inadmissible hearsay and asserts that, as a matter of law, the Lab Report was admissible under section 1280, because the test results were recorded at the time that the test was done. The DMV also contends that after the court found two equally probable interpretations of the March 26, 2007 date on the Lab Report, the court erred in finding in favor of Miyamoto because Miyamoto, not the DMV, had the burden of proof in the trial court.

### I. *General Rules Governing Evidence in DMV Proceedings*

■ The rules governing the evidence available for use in DMV administrative per se hearings "are set forth in . . . the Vehicle Code, commencing with section 14100. (§ 14100, subd. (a).) Two provisions are especially relevant. First, [Vehicle Code] section 14104.7 states in pertinent part: 'At any hearing, the department shall consider its official records and may receive *sworn testimony*.' (Italics added.) Second, for all matters not specifically covered by . . . the Vehicle Code [provisions, Vehicle Code] section 14112 incorporates the provisions of the Administrative Procedures Act governing administrative hearings generally. (Gov. Code, § 11500 et seq. . . .)" (*Lake v. Reed* (1997) 16 Cal.4th 448, 458 [65 Cal.Rptr.2d 860, 940 P.2d 311] (*Lake*).)

■ Government Code section 11513 addresses the admissibility of evidence generally in administrative hearings. (*Lake, supra,* 16 Cal.4th at p. 458.) It provides in relevant part: "(c) The hearing need not be conducted according to technical rules relating to evidence and witnesses, except as hereinafter provided. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions. [¶] (d) Hearsay evidence may be used for the purpose of supplementing or explaining other evidence but . . . shall not be

sufficient in itself to support a finding unless it would be admissible over objection in civil actions." (Gov. Code, § 11513, subds. (c), (d).) "Under subdivision (d) of the statute, a forensic lab report, although hearsay, may be used to supplement or explain other evidence. But it shall not be sufficient in itself to support a finding unless it would be admissible over a hearsay objection in a civil action." (*Molenda v. Department of Motor Vehicles* (2009) 172 Cal.App.4th 974, 987 [91 Cal.Rptr.3d 792] (*Molenda*).) Thus, to support the DMV's finding that Miyamoto was driving with a blood-alcohol content in excess of 0.08 percent, the Lab Report must fall within an exception to the hearsay rule.

■ "In *Lake*, the California Supreme Court held that despite their hearsay nature, blood and urine test reports prepared by government forensic laboratories are admissible in DMV administrative review hearings as official records under the public employee records exception to the hearsay rule, provided they meet the requirements of Evidence Code section 1280, which sets forth the exception." (*Molenda, supra*, 172 Cal.App.4th at pp. 987–988, citing *Lake, supra*, 16 Cal.4th at p. 467.)

Section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

## II. *Standard of Review*

Generally, when ruling on a petition for a writ of mandate challenging an order suspending a driver's license, a trial court exercises its independent judgment to determine " ' "whether the weight of the evidence supported the administrative decision." ' " (*Lake, supra*, 16 Cal.4th at pp. 456–457.) On appeal, we review the record to determine whether the trial court's findings are supported by substantial evidence. (*Id.* at p. 457.)

However, when the appellant challenges a trial court's evidentiary ruling, a different standard of review applies. We review the trial court's rulings regarding the admissibility of evidence under the deferential abuse of discretion standard. (*City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [122 Cal.Rptr.2d 802].) "Specifically, we review the trial court's ruling that the Lab [R]eport did not meet the requirements of . . . section 1280 for an abuse of discretion. 'A trial court has broad discretion in determining whether a party has established [the] foundational requirements [of section 1280].

[Citation.] Its ruling on admissibility "implies whatever finding of fact is prerequisite thereto; a separate or formal finding is, with exceptions not applicable here, unnecessary. (Evid. Code, § 402, subd. (c).)" [Citation.] A reviewing court may overturn the trial court's exercise of discretion " 'only upon a clear showing of abuse.' " ' " (*Molenda, supra,* 172 Cal.App.4th at p. 986, quoting *People v. Martinez* (2000) 22 Cal.4th 106, 120 [91 Cal.Rptr.2d 687, 990 P.2d 563] (*Martinez*), citing *People v. Williams* (1997) 16 Cal.4th 153, 196 [66 Cal.Rptr.2d 123, 940 P.2d 710]; see *Glatman v. Valverde* (2006) 146 Cal.App.4th 700, 703 [53 Cal.Rptr.3d 319] (*Glatman*).)

Case law has set forth various principles describing the abuse of discretion standard. In *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [153 Cal.Rptr. 423, 591 P.2d 911] the California Supreme Court stated: "[T]he appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered." In *Blank v. Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58] the court stated that appellate courts should disturb discretionary trial court rulings only upon a showing of " ' "a clear case of abuse" ' " and " ' "a miscarriage of justice." ' " Other cases suggest that a court abuses its discretion only when its ruling is arbitrary, whimsical, or capricious. (*People v. Branch* (2001) 91 Cal.App.4th 274, 282 [109 Cal.Rptr.2d 870]; *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1614 [38 Cal.Rptr.2d 868].) But as the court stated in *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704] (*Drew*), "[t]his pejorative boilerplate is misleading" since it implies that the trial court's action was "utterly irrational" in every case in which a court is reversed for an abuse of discretion.

*Drew* quoted *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365], in which our State Supreme Court stated: "[T]rial court discretion is not unlimited. 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' " "Abuse of discretion has at least two components: a factual component . . . and a legal component. [Citation.] This legal component of discretion was best explained long ago in *Bailey v. Taaffe* (1866) 29 Cal. 422, 424: 'The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised *ex gratia,* but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " (*Concord Communities v. City of Concord* (2001) 91 Cal.App.4th 1407, 1417 [111 Cal.Rptr.2d 511].) " 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the

confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831 [284 Cal.Rptr. 839].) Applying these concepts here leads us to conclude that the court abused its discretion when it excluded the Lab Report because it applied the wrong legal standard when evaluating the foundational requirements of section 1280.

III. *Analysis*

■ In this case, the trial court concluded that the Lab Report did not meet the timeliness requirement of subdivision (b) of section 1280 because it did not establish that it was prepared at or near the time of the analysis of the blood sample. " 'How soon a writing must be made after the act or event is a matter of degree and calls for the exercise of reasonable judgment *on the part of the trial judge.*' " (*Martinez, supra,* 22 Cal.4th at p. 128, fn. 7.) "[T]he timeliness requirement 'is not to be judged . . . by arbitrary or artificial time limits, measured by hours or days or even weeks.' [Citation.] Rather, 'account must be taken of practical considerations,' including 'the nature of the information recorded' and 'the immutable reliability of the sources from which [the information was] drawn.' [Citation.] 'Whether an entry made subsequent to the transaction has been made within a sufficient time to render it within the [hearsay] exception depends upon whether the time span between the transaction and the entry was so great as to suggest *a danger of inaccuracy by lapse of memory.*' " (*Id.* at p. 128, italics added.)

■ Section 1280 applies to "Evidence of a *writing* made as a *record* of an act, condition, or event . . . ." (§ 1280, italics added.) The Evidence Code defines the word "writing" broadly to include "handwriting, typewriting, printing, photostating, photographing, photocopying, transmitting by electronic mail or facsimile, and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof, and any record thereby created, regardless of the manner in which the record has been stored." (§ 250.) The "writing" at issue here is the recordation of the blood test results in the Lab's electronic database. Since we are presented with records from an electronic database, the critical date for the purpose of the public employee records exception to the hearsay rule is the date that the test results were first recorded in the laboratory's electronic database, which was March 23, 2007. (*Martinez, supra,* 22 Cal.4th at p. 126 [in applying the timeliness requirement from § 1280 "to computer printouts from a database, we consider the length of time between the act, condition, or event and the date of its recording, not the date of its eventual retrieval by computer printout"].)

The appellate court examined the admissibility of forensic lab reports in DMV proceedings under section 1280 in *Glatman, supra*, 146 Cal.App.4th 700 and *Molenda, supra*, 172 Cal.App.4th 974. In *Glatman*, the motorist's blood sample was analyzed on July 25, 2005, and analyzed a second time, by another analyst, a day later. (*Glatman, supra*, 146 Cal.App.4th at p. 702.) Both analysts signed the report, which was dated one week after the first test was done. (*Ibid.*) The DMV argued that the analysts entered the test results into the lab's computer database shortly after completing each test and that the preparation of the report one week later simply involved retrieving the data from the database. (*Id.* at p. 703.) The appellate court disagreed and observed that the record was silent regarding the procedures that the analysts used to record their test results and that there was no evidence that the test results were recorded in a computer database or anywhere else before the report was prepared. (*Id.* at p. 704.) The court held that the case presented a " 'danger of inaccuracy by lapse of memory,' " observed that "memory is subject to erosion with every day that passes," and held that the trial court did not abuse its discretion when it found that the forensic report was not prepared at or near the time of the recorded event. (*Id.* at pp. 704, 705, 706.)

Recently, in *Molenda*, this court held that the trial court did not abuse its discretion when it held that a forensic lab report was inadmissible because it was not prepared at or near the time of the recorded event. In *Molenda*, "there [was] no evidence the test result was entered into a computer database or recorded in any manner prior to the preparation of the written report, which was done one week after the analysis was completed. The report state[d] that '[i]nformation regarding the examination and conclusions are entered into and are maintained within the DOJ Laboratory Information Management System (LIMS) database.' However, it [did] not state when the test results were entered into the database. Moreover, the record [was] silent regarding the lab's policies and procedures for recording test results." (*Molenda, supra*, 172 Cal.App.4th at p. 991.)

This case is distinguishable from *Glatman* and *Molenda*, because the record here is not silent with regard to the procedures used to record the test results. In *Glatman* and *Molenda*, there was no evidence regarding the date that the test results were first recorded. The only evidence was that the reports were prepared six and seven days after the analyses were completed. Here, we have direct evidence that the test result was recorded at the time of the analysis. The certification states that the report "is a true and correct representation of the results of [the] analysis," that "the recording of the analysis results was done at the time of the analysis" and that "the transfer of data for reporting purposes was performed electronically in accord with the laboratory's policies and procedures." Since the test results were transferred

to the written report electronically, it appears they were recorded electronically at the time of the analysis. Moreover, because the results were recorded electronically at the time of the analysis, there was no danger of inaccuracy by lapse of memory since the preparation of the Lab Report did not depend on memory, but simply involved the transfer of information from the Lab's electronic database to the written report. (*Martinez, supra*, 22 Cal.4th at p. 128.)

■ In our view, the trial court abused its discretion because it did not apply the correct legal standard when it evaluated the timeliness of the Lab Report for the purpose of section 1280. The trial court focused on alleged ambiguities in the Lab Report regarding the March 26, 2007 date on the analyst's certification, finding it equally probable that it was either the date that the analyst signed the certification or the date that the "reviewer" reviewed the report. Even if the March 26, 2007 date was ambiguous, the Lab Report unambiguously states that the test results were recorded "at the time of the analysis." The court did not find any ambiguity with regard to the time the test results were first entered into the database and acknowledged that the data was entered at the time of the analysis. That the results were later retrieved and incorporated into a formal written report, that the report was later reviewed by a second employee of the Lab, that the report was later certified by the analyst who ran the test, and that the report of all these events was printed at some later date for use at the DMV hearing does not alter the fact that the test results were recorded at the time the test was performed.[4] Recordation of the test results at the time of testing met the timeliness requirement of section 1280.

Because the trial court focused on the date on the certification, rather than the date that the test results were recorded, it applied the wrong legal standard in assessing the admissibility of the Lab Report under the public employee records exception to the hearsay rule. Since the court did not adhere to the legal principles that govern the admissibility of this evidence, we conclude that the court abused its discretion when it excluded the Lab Report. (*Concord Communities v. City of Concord, supra*, 91 Cal.App.4th at p. 1417; *Department of Parks & Recreation v. State Personnel Bd., supra*, 233 Cal.App.3d at p. 831.)

Because the Lab Report was admissible under the public employee records exception to the hearsay rule, it was sufficient in itself to support the DMV's finding that Miyamoto was driving a motor vehicle with a blood-alcohol level in excess of 0.08 percent. We shall therefore reverse the judgment of the trial court.

---

[4] The *retrieval* of records from an electronic database may create issues involving hearsay or authentication, but such issues are not raised by the parties and, thus, are not before us.

In light of our conclusion, we shall not reach the DMV's contention that, after finding that the date on the certification was ambiguous, the court applied the wrong burden of proof.

## Disposition

The judgment is reversed. The case is remanded to the trial court with directions to enter an order denying Miyamoto's petition for writ of mandate and reinstating the DMV's suspension order.

Duffy, J., concurred.

**RUSHING, P. J.,** Concurring.—I write separately to memorialize my perception that this case exemplifies the unfortunate cloud of confusion that surrounds the "abuse of discretion" standard of review. Properly viewed, the trial court's ruling here was not an exercise of discretion but an application of a rule of law. The trial court had no discretion to decide what the applicable law was or to determine its logical effect in light of the facts found. Its legal analysis was either correct or incorrect. Since this court's power to decide questions of law is paramount to that of the trial court, we are entitled and indeed obliged to reverse any ruling that we find rests upon an error of law, provided of course the error was prejudicial.

At bottom the concept of "discretion" is one of *latitude*. It means that on certain types of issues, the trial court's ruling will survive review even if the members of the reviewing court might have ruled otherwise. Such a standard has two proper functions. One is to shield rulings on issues that the trial court has presumptively *superior competence* to decide correctly. The most obvious and familiar example of this is where the court makes a *finding of fact* on conflicting evidence. Ordinarily such a finding is binding on appeal. If the issue was tried by a jury, this rule has a constitutional dimension, for the right to jury trial would be a hollow thing if judges were free to substitute their own findings for the jury's. But even when the facts are tried by a judge there is a sound reason for appellate deference, which is that the trial judge is in the better position to determine the true meaning of conflicting evidence. This is easy to see in the case of live witnesses, whom the reviewing court has no opportunity to see or hear. It is more difficult to defend in the case of documentary evidence, which may be transmitted to the reviewing court and examined by it with a degree of care and competence seemingly equal to that of the trial court.

The second function of a discretionary standard of review may be best characterized as granting the trial court a kind of arbitral power, not unlike that of a baseball umpire, in the name of judicial economy. This function

recognizes that on certain issues, the trial court's ruling should stand simply because the social cost of questioning it outweighs the private benefit of having a reviewing court substitute its views for those of the trial court. This will most obviously be true where the normative and policy considerations bearing on the issue stand in equipoise, such that reasonable minds obviously could and would differ over the correct result. Basically these are situations in which the law says that a litigant need only be allowed one shot at a favorable adjudication—before the trial judge—and unless that adjudication can be shown to be clearly wrong, it should stand. A deferential standard of review encourages parties to make their best case in the trial court and not to appeal merely on the chance that the reviewing court will feel differently about the dispositive issue.

It may be impossible to generalize about the kinds of issues that will fall within a trial court's discretion. They are probably best viewed as a family of customs that have grown out of the judicial experience of the ages. Obvious examples may be found in the area of equitable remedies, where such questions as the balance of harms may be dependent on such a complex and debatable set of competing considerations that there is no social utility in second—guessing a decision, once it is properly made. In such situations the trial court is empowered, umpirelike, to simply call 'em like it sees 'em, without fear that an appellate court will overrule its "call" simply because, to it, the runner looked safe.

Every zone of discretionary latitude not resting on superior competence represents a grey area within which the correct outcome is doubtful or debatable and so the trial court possesses an arbitral power by a kind of default. A discretionary standard vests in the trial court a zone of autonomy, the dimensions of which may be rendered somewhat more definite by characterizing it as "broad" or "narrow." Although the phrase "abuse of discretion" connotes a sense of moral opprobrium somewhat reminiscent of "miscarriage of justice," it really means only that in making the ruling under scrutiny, the court strayed outside the allowed zone.

In no case is a discretionary standard a license to commit error. Whether the zone in a given setting be broad or narrow, it never extends to getting the law wrong. The law may be obscure; it may be uncertain in the sense that its application to a given situation is not squarely governed by precedent or statute; but it is not the kind of grey area in which the trial court enjoys the autonomy of an umpire. Indeed it is the job of courts, particularly appellate courts, to make it as black-and-white as they reasonably can, so that citizens may shape their conduct to conform to it. The governing law can therefore never be a question entrusted to trial court discretion. Nor, properly under-stood, can the application of law to a given set of facts. The trial court has the

primary authority to decide *what the facts are*, and in some cases may have the primary authority to make a normative judgment about them, but it never has primary authority to decide what rule of law applies.

The trial court's ruling here, as I understand it, rested on the premise that the Department of Motor Vehicles (Department) had failed to establish that the lab report was prepared at or near the time of the blood-alcohol analysis it was offered to prove. This analysis rests on an erroneous legal premise, i.e., that the official records exception to the hearsay rule, on which the Department relied, required that the *written report* have been made at the time of the entry. The actual statutory requirement is that the "writing *made as a record*" of the blood analysis have been "made at or near the time" of the blood analysis. The "writing made as a record" of the blood analysis was not the printed lab report offered in evidence, but the computer entry of which that printed report was a secondary or derivative record. The report was not objected to on the ground that it did not comply with the rules governing secondary evidence of writings. (See Evid. Code, §§ 1520–1567 & especially 1530 [official writings], 1552 [printed representations of computer data].) It was objected to on grounds of hearsay. In that context it constituted one of two layers of hearsay. The earlier layer was the computer entry "made as a record" of the blood analysis. That entry satisfied the contemporaneity requirement; the technician's uncontested certification recited that "the recording of the analysis results was done at the time of the analysis."

The date of the *printout* was relevant only to the second layer of hearsay, which was the lab report's assertion that the earlier entry had been made. The report came within the official records exception for that purpose if it was made near the time of the "act, condition, or event" *it* recorded, i.e., the presence in the computer system of the entry it reiterated. The printed report was necessarily made while this condition existed, because it is presumably impossible to print out or otherwise retrieve information that is not present on the computer from which it is retrieved. The report was therefore created at or about the time of the condition it described. Since it also established that the underlying event—the blood-alcohol test—was recorded at or about the time of *its* occurrence, both hearsay layers came within the official records exception to the hearsay rule.

The trial court might have had discretion, at least in theory, to find that some of these facts were otherwise. Conceivably it could have refused to credit the technician's averments. But it had no discretion to accept the averments and then sustain a hearsay objection. That was an error of law. It did not depend on any fact the trial court was peculiarly competent to find. It did not fall within any "grey area." It is therefore not shielded by a deferential standard of review. I do not understand the majority opinion to

actually hold otherwise, but my colleagues feel constrained to reiterate hoary judicial recitals that the issue was entrusted to the trial court's discretion. In my view such recitals can only perpetuate the confusion and perplexity already attending this subject.