Filed 1/30/14  In re Katherine B. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re KATHERINE B. et al., Persons Coming Under the Juvenile Court Law. | B245573 (Los Angeles County Super. Ct. No. CK42727) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>PERCY B. et al.,<br><br>        Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Affirmed in part and reversed in part as to Percy B. (Father), reversed as to D.F. (Mother) and remanded for further proceedings.

Edi M.O. Faal for Defendant and Appellant Percy B. (Father).

John E. Carlson and Nancy Nager for Defendant and Appellant D.F. (Mother).

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

In this appeal, a mother and father challenge the dependency court's jurisdictional orders as to one of their children. The dependency court found the father had sexually abused his elder daughter (now 19) on numerous occasions from the age of nine forward. In addition, when she was 12 years old, a 47-year-old family friend had sexually molested her for a period of about 18 months. Thereafter, the court found, she demonstrated severe emotional damage through conduct including highly sexualized behavior, lying, defiance and further claims of sexual abuse, but her parents failed to provide her with appropriate medical care and psychological treatment which placed her at substantial risk of further harm. The mother claims the evidence does not support the dependency court's order as to her and she was deprived of due process. The father's challenge is limited to meritless attacks on his daughter's credibility. We affirm as to the sexual abuse count involving the father. However, we agree with the mother that the dependency court's creation of a new count as to both parents for failure to provide appropriate medical care and treatment following the discovery of another perpetrator's sexual abuse of their daughter violated due process. Therefore, we reverse as to this count (as to both parents) and remand for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

In August 2011, the Los Angeles County Department of Children and Family Services (the Department) was notified Katherine B.-F. (16 years old at the time) was the victim of sexual abuse by her adoptive father Percy B., and she and her two siblings, Celine B.-F. (a 12-year-old girl) and D. B.-F. (a 15-year-old boy), were victims of general neglect by both of their adoptive parents, Percy B. and D. F.[1] According to the Department's detention report, in the past, Katherine had hinted to her writing program mentor there was trouble at home but then had recently disclosed that her adoptive father had been sexually abusing her for years, and she was in grave fear about the trouble her

---

[1]    The elder son (J. B.-F.) is now an adult.

2

disclosure would cause, especially with respect to her basketball scholarship. Her adoptive father was reportedly "very involved in talented youth basketball scholarships."

The Department noted that allegations of general neglect and physical abuse had been filed in May 2000 and were found to be substantiated. At that time, the family had received court-ordered family reunification services, followed by family maintenance services to include substance abuse treatment, parenting classes and counseling. As of March 2002, both parents had completed and complied with all court orders, and D. F. (a dentist) was acquitted of child endangerment charges in a criminal hearing. The children had not participated in counseling as their parents "don't[ ] believe in counselors and don't want them to talk about the family."

Regarding her recent disclosure of sexual abuse, Katherine said she was afraid to tell her mother because there had been an incident several years before when she was "dating" a 47-year-old man associated with her basketball program. The matter went to court and Katherine's mother was very angry with her. Katherine feared her mother would blame her for these events as well and Katherine was "very afraid" to let her know. She felt she could not go home.

Katherine told the social worker that Percy B. had been coming into her room routinely each night after she had gone to sleep from the time she was nine years old. She said he would caress, touch and feel her body, including her legs, arms and thighs. Most recently, a few nights before the interview, Katherine said Percy B. woke her by placing his hand on the back of her thigh and digitally penetrating her three times. She said he would also expose his penis to her on various occasions and would put it in her face. Katherine said she would roll over or try to move him away. She said her sister was asleep in the same bedroom but never woke up. Her mother and the rest of the family would be asleep when Percy B. came into Katherine's room so no one else witnessed what Percy B. was doing. Sometimes, she said, she would go to the bathroom, lock the door and try to sleep there to avoid the abuse because it had been happening for

years. She said her relationship with Percy B. was "normal during the day and different at night."

In addition to her past 18-month "involvement" with the 47-year-old father of another student athlete, Katherine told the social worker she had alleged a male classmate at her school had sexually assaulted her. Initially, Katherine said, she had reported the act was "mutual" (just as she described the sexual abuse by the 47-year-old) but said she reported the classmate because he had wanted to have sex with her and she had refused but then he had told other students at school that they did have sex and she got upset with him telling people they had had sex. She said she wrote a letter to him and his family and the principal to apologize for the sexual assault allegations. She said she was sexually active and had had several partners.

When Katherine's mother D. F. was interviewed, she told the social worker she did not believe her daughter because of her history of alleging sexual assault. D. F. said she had adopted Katherine at the age of four and said Katherine had been drug-exposed as an infant. She said Katherine had been displaying serious behavioral problems since the beginning of her adolescence and typically isolated herself from D. F. and the rest of the family and "like[d]" to lock herself in the bathroom. She said Katherine participated in therapy for over a year but stopped when the family could no longer afford the expense. D. F. said she was a dentist, and she was sued in 2000 for allegedly over-sedating patients. She said she was acquitted but had considerable attorney fees to pay and had to work long hours during the week.

Percy B. could not be located and had reportedly left the family home.

D. F. signed an affidavit indicating she released custody of her daughter pending resolution of the allegations against Percy B., and Katherine was taken into protective custody.

In investigating the family's prior involvement with the Department, the social worker reported a May 2000 referral following D. F.'s arrest when she was charged with 14 counts of willful child cruelty for allegedly over-anesthetizing 50 children in her

4

dental practice.  As a result, one child had suffered brain damage and another was described as "near death."  At that time, D. F. was Celine B.-F.'s foster mother, and it was alleged D. F. had physically abused her as well as two other children with the same last name as D. F.  The disposition of these referrals was "Inconclusive."  Later that month, however, a referral involving the three older children (not including Celine B.-F.) for neglect and physical abuse was found to be substantiated against both D. F. and Percy B.  In April 2008, another referral was generated relating to Katherine's sexual abuse by Alan Rudisill; there was "no disposition" as to that referral.

In August 2011, the Department filed a Welfare and Institutions Code section 300 petition on Katherine's behalf against Percy B. and D. F., alleging that Katherine had suffered or was at substantial risk of suffering serious physical harm or illness within the meaning of subdivision (b) of Welfare and Institutions Code section 300 (all further undesignated statutory references are to the Welfare and Institutions Code) and had been sexually abused or was at substantial risk of being sexually abused within the meaning of subdivision (d) of section 300.  At the detention hearing, the dependency court found Katherine to be a minor described by subdivisions (b) and (d) of section 300 and found a prima facie case for detaining her.  The following day, Katherine was released to her mother's custody, on the condition that D. F. and Katherine would reside with Katherine's maternal aunt.  Percy B. was granted monitored visitation with a monitor other than D. F.

As of September, the Department noted several concerns.  Both Katherine and Celine B.-F. had forensic examinations, and the exam results for Celine "revealed assault related findings."  Katherine had been forced to attend Percy B.'s birthday party, she had been told she could no longer attend the Write Girl mentoring program and Katherine reported she was being pressured to retract her statements "so the family can go back to normal."  D. F. did not believe Katherine, D. F. said she "fully supports [Percy B.] in all way[s] necessary" and it appeared to the social worker that Katherine was being isolated to force her to recant.  When the social worker attempted to interview Celine regarding

sexual abuse, her affect changed from "animated" to "flat" and she became withdrawn. She denied any sexual abuse. She dropped her head, lowered her voice and said, "no, my sister is lying my dad would never do anything like that."

When the social worker showed D. F. the results of Celine's examination, D. F. said it was "impossible" and said she would get a second opinion. She said, "I don't believe that those were the results. I believe that the Police department is doing something funny." Based on these events and the fact Celine and D. were living at home with Percy B., the Department obtained a removal order as to the younger two children in addition to Katherine. In September, the Department filed another petition on behalf of Celine and D. based on the same allegations plus an allegation under subdivision (j) of section 300. Thereafter, Celine and D. B.-F. were released to D. F.'s custody on condition that Percy B. move out of the family home.

When the Department attempted to interview Percy B. and D. F., both indicated they would contact the social worker after speaking with their respective attorneys, but neither did. Further, D. F. would not allow the social worker to speak with Celine; D. B.-F. "just want[ed] them to find [Percy B.] innocent so everyone can come back home."

Later, in a Last Minute Information for the Court report filed in November, the Department advised the dependency court that Percy B. continued to refuse to answer questions about the allegations in the petition but told the social worker Katherine had previously made false allegations against a boy at school and the police considered filing charges against her for being untruthful but said the case was dropped when she wrote letters of apology to everyone involved. Percy B. said Katherine was "involved in a lot of sexual activities including boys her age and the older man she was involved with."

Ultimately, the dependency court heard the matter over several days of testimony. In its amended statement of decision, following a jurisdictional hearing that lasted over 15 days, with testimony from 11 witnesses, the dependency court found as follows:

"Katherine testified multiple times over the course of the trial, on April 10 and 11 and June 6, 2012. At trial, she was 17 years old. Throughout the proceedings, Katherine

6

has been consistent in her testimony and in her reporting to the Department and to other collaterals such as Dr. Kaser-Boyd, that [Percy B.] had been sexually abusing her since she was nine years old. She stated that he would come into her room at night after everyone was asleep and he would touch her. At various times he had touched her vagina, buttocks, breasts, legs, inner thighs and private areas around her vagina and buttocks. There were also times when he had put one or two fingers inside her vagina, kissed her chest and outer thighs and exposed his penis to her. She said the touching started when she was nine years old and continued until she was sixteen years old. Although Katherine shared a bedroom and even a bunk bed during much of her childhood with younger sibling C[.], she testified that she never saw C[.] wake up or stir during the times [Percy B.] was in the room. Katherine also testified her dog slept in the room, but it did not bark when [Percy B.] would come into her room at night.

"Katherine described in great detail, even drawing a map, an incident in a hotel room in San Francisco where [Percy B.] and older sibling J[.] were present. On that occasion, she told the Court that [Percy B.] had molested her and then described how [he] had made her change her pajama bottoms because they were wet from female bodily fluids after he molested her. She remembered the kind of pajamas she was wearing, what [Percy B.] said to her during and after the molestation, and other specific details. Although she said C[.] was on the trip (staying in a different hotel with her teammates), C[.] denied ever going on the trip. J[.] testified that he did not remember that San Francisco trip and did not remember going to a hotel with just his sister and father. However, the Court finds that J[.]'s testimony lacked credibility. J[.]'s demeanor while testifying indicated he was either extremely nervous or just simply did not remember basic information about his childhood. [D. F.] also denied the trip ever took place and testified that the family never went to any out-of-town hotels without her. On this subject, however, the Court gave more credibility to Katherine's testimony because of her ability to recall specific details and her demeanor while testifying about this event.

"Katherine's cousin, V[.] F[.], testified that she had stayed in the B[.]-F[.] home during the years of the alleged abuse and often slept in the same room as Katherine (and C[.]). She testified that she never heard, saw or woke up to find anything unusual happening in the bedroom. V[.] F[.] testified that, unlike C[.], (who is a heavy sleeper) she is a light sleeper. While the Court found her to be a credible witness, her testimony did not outweigh Katherine's testimony for the same reasons stated above. In addition, Katherine's testimony contained elements that did not appear made up or imagined and remained consistent.

"Katherine testified that she never told anyone about the abuse because she thought that her entire life would come 'crashing down' and that she would not be able to go to the same school, play basketball, and have a normal life. She stated that she thought she could 'deal with it' until she left for college.

"When questioned if she ever told her mother about the abuse, Katherine stated that she never directly told her, but she did recall a conversation she had with mother one morning when mother had been angry because Katherine was late getting up for school. In response, Katherine muttered under her breath, 'I wouldn't have been late if you could keep your husband out of my room every night.' When mother responded by saying, 'What?' Katherine just told her, 'Never mind.'

"Katherine's mother further testified that Katherine never told her about the abuse. The court found her testimony credible on that issue.

"Katherine testified that she never told her because she did not think her mother would believe her because her mother had not been supportive of her after the 'Rudisill' incident. Katherine testified that she had been involved with a family friend, Alan Rudisill, who was forty-seven years old . . . . This 'relationship' began when Katherine [was only 12 years old and] continued for approximately eighteen months until it was discovered. Katherine felt [D. F.] blamed her for what happened with Rudisill and that [D. F.] continued to treat her differently because of it. Katherine testified that her relationship with [D. F.] had already been strained, but after the Rudisill incident, it was

8

never the same. Katherine further acknowledged in interviews with the social worker that she *did* continue to display sexualized behaviors and she felt that [D. F.] thought that Katherine was a 'whore.'

"Although Alan Rudisill was sentenced to a significant term in prison, the testimony illustrated that Katherine never received any meaningful sexual abuse or trauma-based counseling.

"When questioned about whether or not Katherine ever received any therapy for the sexual abuse she suffered as a result of the Rudisill incident, [D. F.] testified that she and [Percy B.] put Katherine in counseling for a few months although she was confused as to whether the counselor was a psychologist or a psychiatrist.

"The [social worker] reported that [D. F.] told her that she and [Percy B.] might have stopped the therapy because of their finances, but at trial [D. F.] testified that after two months of therapy, the therapist recommended Katherine attend group-type meetings instead. [D. F. and Percy B.] then took Katherine to a faith-based program called, 'Faith-dome,' for children with behavioral problems.

"After only a few sessions, [Percy B.] found out that Katherine was texting a boy and leaving during the sessions. In response, [D. F. and Percy B.] terminated Katherine from the program and did not re-enroll her in any form of counseling. [D. F.] testified that she and [Percy B.] thought that if Katherine needed to speak with someone she could see a school counselor at [her private school], where she was starting the school year.

"[D. F.] portrayed Katherine as an out of control teenager who constantly lied about her comings and goings and sexual encounters. In response to these issues, [D. F. and Percy B.] placed severe restrictions on Katherine and monitored her every move. Katherine was not allowed to leave the house unless a family member accompanied her. [D. F.] described that Katherine had been placed on this 'lock down' for the majority of the summer before the sexual abuse allegations were uncovered. [D. F. and Percy B.] contend that these harsh punishments were the reason and motivation behind Katherine making these false allegations of sexual abuse against [Percy B.]. Throughout the case,

9

Katherine never mentioned anger or resentment for these alleged punishments, neither in any of the interviews nor at trial.

"Dr. Kaser-Boyd, a clinical and board-certified forensic psychologist specializing in child abuse and in malingering/faking, was called to testify about her evaluation of Katherine's statements regarding [Percy B.]'s abuse and whether or not they were credible.

"She noted that Katherine's description of the abuse was consistent with what was often seen in situations of sexual abuse, i.e., the abuse occurring in the middle of the night, when she was already in bed, and everyone else is sleeping; and the coping mechanisms that children often employ during and after the abuse such as pretending to be asleep as well as the denial and minimization of the abuse to try and pretend like it did not happen.

"Dr. Kaser-Boyd testified that severe nightmares and certain content of the nightmares are often symptoms of abuse. [D. F.] testified that Katherine often had nightmares and Katherine's foster mother recently reported the same. The doctor stated Katherine's recurring nightmares of being immobilized are typically seen in people who have been victimized and have felt powerless and immobile. Dr. Kaser-Boyd could not pinpoint 'who' molested Katherine, but identified her as being a likely victim of abuse. She also noted that Katherine's report of her 'relationship' with Alan Rudisill was very unusual and it raised the high suspicion that she had already been subjected to some sexualization before the relationship began when she was twelve years old.

"Dr. Kaser-Boyd conducted psychological testing on Katherine to determine if she was likely exaggerating or lying about the incidents she was reporting. In her testimony, Dr. Kaser-Boyd described Katherine's elevated scales of childhood abuse as well as peer insecurity and sexual discomfort, which are symptoms often seen in children who have been molested. She explained that Katherine was not elevated on scales reflecting unusual anger or acting out—behaviors that are seen in delinquents—symptoms that would be important in determining whether Katherine would destroy a family to have her

10

own way.  The doctor specified that these findings were consistent with *both* types of molestation that Katherine had described—by Alan Rudisill and [Percy B.].

"In her expert opinion, Dr. Kaser-Boy[]d testified that the results from the evaluation supported:  the history of abuse Katherine had described, that Katherine was not exaggerating her report of [Percy B.]'s molestation, and that she displayed symptoms that were consistent with her accounts of abuse.

"Katherine described another earlier incident of being sexually assaulted by a boy after a basketball game when she was about eleven years old.  [D. F.] testified and [Percy B.] put on numerous witnesses to testify about Katherine's behavior problems, which included lying, sexualized behavior and some drug use.  There was also a significant incident in high school where Katherine accused a boy of sexually assaulting her and was apparently later threat[en]ed by the district attorney's office with charges for making a false accusation.  She was told that the district attorney would not take action[] against her if she promised to sign letters of apology to those involved.  There were points during her testimony where Katherine seemed to not understand basic questions.  She appeared hesitant and not confident compared to her earlier testimony, which was clear and coherent.

"Regarding her disclosure to her writing coach, Melissa Wong, Katherine testified that she start[ed] gradually disclosing some things to Ms. Wong during their writing sessions.  Katherine stated:

[']I began telling her things, like I couldn't remember a time when someone wasn't hurting me.  She would ask me questions and I guess I would answer them in a way that would cause her to believe that something was going on at home, but I would never tell her straight out what was going on.  She would always ask[] me why I wouldn't answer these questions and I would tell her I am scared because I don't—like I said, I don't want my life to fall apart.  I don't want to be kicked out of my home. . . .  I never specified that it was my dad, but I specified that it wasn't the other people in the house.[']

"Katherine also testified that [Percy B.] would occasionally give her alcoholic drinks at night and she described the type of drinks. She said that she did not feel drunk but sometimes she felt funny. She stated that it did not happen regularly but more in the summer. Her sister, C[.], denied that [D. F. and Percy B.] had any alcohol in the house. [D. F.] testified that [she and Percy B.] sometimes drank wine at home. . . .

"The evidence preponderates that [Percy B.] is the perpetrator of sexual abuse as defined in section 300 subdivision (d) against his daughter, Katherine [B.-F.]. Although Katherine also has a history of sexual abuse by an adult family friend, and other acting out behaviors, which have included false allegations of sexual abuse and lying, these behaviors and/or incidences do not negate Katherine's consistent, detailed and reliable testimony. Once Katherine started telling her story, she never wavered. She had no obvious reason to lie or make up the abuse. While [D. F. and Percy B.] have posited the theory that Katherine was angry about the restrictions they had placed on her at home, there was insufficient evidence at trial for this Court to make any reasonable findings in support of this theory. In fact, as her counsel points out, Katherine's 'acting out behaviors' have calmed down significantly since she has left the home, not the opposite. She has done quite well in the foster home and recently was awarded honor rol[l] at her already prestigious private school . . . .

"As to whether or not [Percy B.] gave Katherine alcohol, the Department did not meet its burden by a preponderance of the evidence. Even if the Court is to believe that [Percy B.] gave Katherine alcohol while she was a minor, there was insufficient testimony or evidence from the Department to support a finding that the alcohol, in and of itself, posed a substantial risk to the child or was somehow connected to the sexual abuse.

"Thus, as to the petition filed on August 23, 2011, the Court dismisses B-2 and finds true as amended B-1 and D-1 as follows:

"The child, Katherine B[.]-F[.]'s father, P[.] B[.], sexually abused the child on numerous occasions since the child was nine years old. On prior occasions, [Percy B.] fondled and digitally penetrated the child's vagina. [Percy B.] removed the child's clothes prior to fondling the child's vagina and rubbed lotion on the child's vagina. On prior occasions, [Percy B.] kissed and fondled the child's breasts. The sexual abuse by [Percy B.] endangers the child's physical health and safety and places the child at risk of physical harm, damage, and sexual abuse.

"In regard to the Department's allegation that [D. F.] failed to protect, there was insufficient evidence to prove [D. F.] knew or should have known that Katherine was being molested.

"However, the Court adds a b-3 count, consistent with Welfare and Institutions Code section 348, finding the following:

"300 b-3 as follows:

"At or about age twelve, a family friend who was about age forty-seven, sexually molested the child, Katherine B[.]-F[.], over the span of approximately eighteen months. Since that time Katherine has exhibited severe emotional damage including, but not limited to, numerous claims of sexual abuse, lying, defiance, and highly sexualized behavior. Her parents, D[.] F[.] and P[.] B[.] have failed to provide her with the medical [sic] appropriate care and psychological treatment placing her at risk of substantial future harm and damage. . . ."

The court expressly acknowledged it had "created" a new count.

On October 10, the dependency court declared the children dependents, with D. and Celine ordered placed with D. F. under the Department's supervision, and Katherine removed from her parents' custody. Both parents were to be provided with reunification and family maintenance services.

13

Percy B. and D. F. appeal the dependency court's orders relating to Katherine only.[2]

## DISCUSSION

### Percy B.'s Appeal

Percy B. has not included a single citation to the record in his "summary of relevant facts" in which he instead argues that Katherine lies, her testimony is "simply unbelievable and incredible" and says there was no "credible" evidence of sexual abuse. He says he "is a highly educated certified [f]inancial [p]lanner who did his undergraduate and graduate studies at UCLA [so i]t is inconceivable" he would have acted as Katherine described in her testimony; "[o]nly a fool will expose his crime in that manner." The dependency court's orders are presumed correct, and it is the appellant's burden to

---

[2] By ignoring the findings and orders as to both Celine B.-F. and D. B.-F., Percy B. and D. F. have waived any issues as to either of these two children. (*Kim v. Sumitomo Bank of California* (1993) 17 Cal.App.4th 974, 979.)

Percy B. was permitted to return home as long as both he and D. F. participated in court ordered programs. His contact with the children was to be monitored by D. F. or another monitor. Katherine, D. and Celine were all to be provided with individual counseling to address sexual abuse, with D. and Celine to be enrolled in therapy while attending school out of state.

We requested and obtained subsequent minute orders in this case and take judicial notice of them. Pursuant to Evidence Code sections 452, subdivision (d), and 459, subdivision (a), we take judicial notice of these orders. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1487, fn. 3.)

In April 2013, Katherine was declared a non-minor dependent and services for her were terminated, with a further hearing set for October 9, 2013.

Meanwhile, in September, the court terminated jurisdiction as to D. but retained jurisdiction as to Celine, with services to continue.

As of October 9, 2013, Katherine remained a dependent child, and remained in her placement, with the Department ordered to provide the family with permanent placement services, with a further hearing scheduled for April 2014.

14

demonstrate error by citing evidence supported by legal authority; if an appellant fails to do so, he may be deemed to have abandoned his appeal. (*In re Sade C.* (1996) 13 Cal.4th 952, 994; *Cresse S. v. Superior Court* (1996) 50 Cal.App.4th 947, 955 [dismissal is appropriate under such circumstances].)

Not only has Percy B. failed to provide citations to the record supported by citations to relevant legal authority, but he has completely ignored the evidence supporting the dependency court's conclusions as well as the applicable substantial evidence standard of review. (*In re James C.* (2002) 104 Cal.App.4th 470, 482; and see generally *People v. Elliott* (2012) 53 Cal.4th 535, 585 ["unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction"].) The dependency court found Katherine credible (see *In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 ["impeachment is not impossibility"]), and the social workers' and expert witnesses' testimony supported the dependency court's findings as well. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734; *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427 [we defer to the trial court's factual assessments; we "review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of witnesses"].) A single ground suffices to support the dependency court's exercise of jurisdiction. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72.)

It appears Percy B. purports to challenge not only the dependency court's determination he sexually abused Katherine, supporting jurisdiction under subdivision (d) of section 300 (as the court did find, and we affirm), but also attacks the allegation he had given her alcohol (a separate count the court did not sustain). Yet, Percy B. ignores the additional count on which the dependency court based its jurisdiction as to Katherine— the determination that both parents had failed to provide her with appropriate medical care and psychological treatment which placed her at substantial risk of future harm. (§ 300, subd. (b).) Notwithstanding Percy B.'s failure to address this count, we find (as D. F. argues and as we explain in the context of her appeal) the dependency court's creation

15

of this new count and exercise of jurisdiction on this basis violates due process, and reversal is required as to this count only for both parents.

**D. F.'s Appeal**

D. F. says the dependency court committed reversible error when it created and sustained its own count that when Katherine was molested at the age of 12, D. F. "failed to provide her with medical [sic] appropriate care and psychological treatment, placing her at risk of substantial future harm and damage." She says the variance between the allegations alleged in the petition and the count created and sustained by the dependency court was so substantial that it violates due process. In this respect, we must agree with D. F.

As D. F. notes, the "allowance of amendments to conform to proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused." (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.) "'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.'" (*Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1218, citations and further internal quotation marks omitted.)

Section 348 entitled "Variance and Amendment of Pleadings" provides the dependency court with authority to amend a dependency petition to conform to proof to the same extent and with the same effect as in civil actions.[3] Code of Civil Procedure section 469 states as follows: "No variance between the allegation in the pleading and the

---

[3] "The provisions of Chapter 8 (commencing with Section 469) of Title 6 of Part 2 of the Code of Civil Procedure relating to variance and amendment of pleadings in civil actions shall apply to petitions and proceedings under this chapter, to the same extent and with the same effect as if proceedings under this chapter were civil actions." (§ 348.)

16

proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense on the merits."

In *In re Andrew L.* (2011) 192 Cal.App.4th 683, the court held it was not prejudicial error to conform the petition to proof by striking entirely a section 300, subdivision (a), count, as well as the specific allegation of a diagnosis of a subdural hematoma caused by trauma in the subdivision (b) count, when the remaining subdivision (b) allegations that the child was at substantial risk of serious physical harm or illness were proved. (*Id*. at pp. 689-690.) In *In re David H.* (2008) 165 Cal.App.4th 1626, the court held a petition under section 300, subdivision (a), that alleged the child had suffered serious physical harm inflicted nonaccidentally by his mother could properly be amended to conform to the proof presented at the hearing that the child faced a current substantial risk of harm if returned to the mother's custody.[4] (*Id*. at pp. 1644-1645.)

In *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041-1042, the court held it was error for the dependency court to refuse to permit an amendment that modified the description of the sexual abuse alleged by substituting the word "touching" for "penetrating" the child's vagina. (*Id*. at p. 1042.) Thus, in each of these decisions endorsing a liberal rule for allowing amendments to conform to proof, the gravamen of the dependency petition remained the same.

In this case, however, the proposed amendment effected a fundamental change in the harm to the child or the parental misconduct alleged. (Cf. *In re Man J.* (1983) 149 Cal.App.3d 475, 481, 197 Cal. Rptr. 20 ["the juvenile court has discretion to permit amendment of a juvenile court wardship petition to correct or make more specific the factual allegations supportive of the offense charged when the very nature of the charge

---

[4]    Although ruling it would have been permissible on the record before it to amend the petition to conform to the proof presented of a current risk of substantial harm to the child, the court in *In re David H., supra,* 165 Cal.App.4th 1626 held past infliction of serious physical harm was sufficient to establish jurisdiction under section 300, subdivision (a), whether or not there was also proof of a current risk of harm. (See *In re David H., supra,* 165 Cal.App.4th at pp. 1641-1644.)

remains unchanged"].) Indeed, in *In re Jessica C., supra,* 93 Cal.App.4th 1027, the court condemned as a due process violation the type of amendment to conform to proof not unlike the amendment at issue here: "[S]uppose a petition only alleges, under subdivision (d) of section 300, a variety of specific sexual acts perpetrated by a parent, but the trial judge does not find these are true. The county then attempts to amend the petition to allege serious emotional damage under subdivision (c) of section 300, based on the idea that any child who would make such allegations, even if false, has obviously been subject to emotional abuse. Such a tactic would be nothing more than a cheap way to establish dependency without giving the parent adequate notice of dependency jurisdiction under an emotional abuse theory." (*Id.* at p. 1042, fn. 14.)

In this case, rather than a "cheap tactic," we understand the dependency court's action as a well-intentioned effort to protect Katherine and provide services for her and her family. Nevertheless, in light of the court's intention to proceed in the manner it did, we must conclude that, at the very least, the evidentiary portion of the hearing should have been reopened to allow (after an appropriate continuance) D. F. to present evidence to refute the amended allegations. Significantly, in the *Jessica C.* and *Andrew L.* cases, the Department made a motion to amend the petition, which did not occur in this case. Moreover, unlike the insubstantial amendments permitted in the *Andrew L.* and *Jessica C.* cases, it is impossible for us to reconcile the dependency court's considerable and dramatic change in the basis proffered for dependency jurisdiction with D. F.'s (and Percy B.'s) fundamental right to notice and a fair opportunity to respond to the actual grounds upon which the petition was sustained. (See *In re Wilford J.* (2005) 131 Cal.App.4th 742, 751 ["a parent whose child may be found subject to the dependency jurisdiction of the court enjoys a due process right to be informed of the nature of the hearing, as well as the allegations upon which the deprivation of custody is predicated, in order that he or she may make an informed decision whether to appear and contest the allegations"]; *In re Justice P.* (2004) 123 Cal.App.4th 181 ["[d]ue process requires that a parent is entitled to notice that is reasonably calculated to apprise him or her of the

18

dependency proceedings and afford him or her an opportunity to object"]; *In re C.P.* (1985) 165 Cal.App.3d 270, 271 [due process requires that parents be afforded notice and an opportunity to be heard at a jurisdiction hearing]; see generally *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 117-118 [juvenile court safeguarded parent's rights to procedural and substantive due process by providing him notice and an opportunity to be heard, including the right to present evidence and to confront witnesses].)

Although Katherine's prior sexual abuse was discussed throughout these proceedings, the petition as originally alleged identified D. F.'s failure to protect Katherine in the context of Percy B.'s sexual abuse. Pursuant to the dependency court's findings and order, however, the court expressly found that D. F. did not have reason to know of Percy B.'s sexual abuse of Katherine, but at the same time found jurisdiction proper for D. F.'s failure to ensure that Katherine received the appropriate medical care and psychological treatment at the time she (D. F.) learned of Katherine's sexual abuse by Alan Rudisill—years before. Consequently, D. F. had no notice evidence should be presented concerning the nature and severity of the emotional damage Katherine was suffering *as a result of the abuse by Alan Rudisill,* her own responsibility for the onset of such damage and her responsibility for Katherine's continued suffering because she minimized and denied the seriousness of the emotional damage Rudisill's sexual abuse caused 12-year-old Katherine and refused to seek appropriate care for her. (See generally *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1381-1382, [when a child is well-adjusted except for a deep fear or dislike of one parent, the court lacks a basis for assuming jurisdiction under § 300, subd. (c), even when parents have subjected the child to a rancorous family law dispute]; *In re Alexander K.* (1993) 14 Cal.App.4th 549, 557 ["[T]he parental conduct branch of subdivision (c) seeks to protect against abusive behavior that results in severe emotional damage. We are not talking about run-of-the-mill flaws in our parenting styles—we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms identified in the statute."].)

19

Not only was D. F. deprived of notice of the allegations upon which jurisdiction was ultimately premised, but the dependency court based jurisdiction on subdivision (b) of section 300, but described emotional damage and the failure to provide psychological treatment. Section 300, subdivision (c), provides, in part, a child may be adjudged a dependent child of the juvenile court if she "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian . . . ." Meanwhile, subdivision (b) "means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a substantial risk of *serious physical harm or illness*." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, italics added.) "Neither section 300, subdivision (a) nor (b) provides for jurisdiction based on 'emotional harm.' Subdivisions (a) and (b) state that the court may adjudge a child a dependent of the court if '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious *physical* harm . . . .'" (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717-718; original italics.)

On the record before us the jurisdiction findings under section 300, subdivision (b), must be reversed, and the disposition order removing Katherine from D. F.'s care and custody vacated. (*In re David M.* (2005) 134 Cal.App.4th 822, 833; *In re Janet T.* (2001) 93 Cal.App.4th 377, 391.) Given the procedural posture, the record and the fact two younger siblings remain, we decline D. F.'s request that we dismiss the dependency proceedings at this point. Our conclusion that the amendment to conform to proof was improper for lack of adequate notice does not mean the Department cannot try again or that it may not be in Katherine's best interests for her to be removed from D. F.'s custody (See *In re Janet T., supra,* 93 Cal.App.4th at p. 392.) However, circumstances may have arisen during the pendency of this appeal that could affect the dependency court's evaluation of any new petition filed by the Department. Accordingly, in any further

proceedings on remand the dependency court should give appropriate weight to Katherine's and the family's current situation.

### *DISPOSITION*

The jurisdiction and disposition orders regarding Katherine are affirmed as they relate to Percy B.'s sexual abuse of Katherine, and reversed as to D. F. and Percy B. on the section 300, subdivision (b) count for failure to provide appropriate medical care and psychological treatment for prior sexual abuse.  The matter is remanded to the dependency court for further proceedings not inconsistent with this opinion.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**

**SEGAL, J.***

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21