Filed 9/28/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SUZANNE COE, | D068814 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2015-00009890-CU-MC-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County,

Randa Trapp, Judge. Affirmed.

The Gilleon Law Firm, Daniel M. Gilleon; Law Office of Steve Hoffman and

Steve Hoffman for Plaintiff and Appellant.

Jan I. Goldsmith, City Attorney, Mary T. Nuesca, Assistant City Attorney and

Paige. E. Folkman, Deputy City Attorney for Defendant and Respondent.

I

INTRODUCTION

Suzanne Coe appeals from a judgment denying her petition for writ of

administrative mandate challenging a decision by the City of San Diego (City) to revoke

her nude entertainment business permit.[1]  She contends certain sections of the San Diego Municipal Code[2] applicable to nude entertainment businesses are unconstitutionally vague and do not give sufficient guidance to the permit holder or to the enforcement agency.  She further contends the City's decision to revoke her permit improperly relied upon inadmissible hearsay evidence and there is otherwise insufficient evidence to support the findings underlying the decision.  Finally, she contends the penalty of revocation violated her due process rights because it was arbitrary and capricious.  We are not persuaded by these contentions and affirm the judgment.

## II

## BACKGROUND

### A

In San Diego, it is unlawful to operate a nude entertainment business without a police permit.  (§ 33.3603.)  It is also unlawful for a responsible person to allow a nude person within six feet of a patron (six-foot rule); an adult entertainer to intentionally touch a patron or a patron to intentionally touch an adult entertainer during a performance

---

[1]     For purposes of this appeal, " '[n]ude entertainment business' means any establishment or business operating at a fixed location where (a) any person engages in or operates nude entertainment, or (b) there are live performances which are distinguished or characterized by an emphasis upon the display of specified anatomical areas or specified sexual activities.  It includes nightclubs, bars, lingerie modeling studios, and similar commercial establishments commonly known as 'topless' or 'nude.' "  (§ 33.3602, italics omitted.)

[2]     Further statutory references are to the San Diego Municipal Code unless otherwise stated.  (<https://www.sandiego.gov/city-clerk/officialdocs/legisdocs/muni> [as of Sept. 26, 2016].)

(no-touch rule); or a person to touch, caress, or fondle specified anatomical areas of another person (no-fondling rule).[3] (§ 33.3609, subds. (c), (d) & (f).) Parallel prohibitions apply to adult entertainers. (§ 33.3610, subds. (a)-(c).)

Coe has a permit to operate a nude entertainment business in San Diego. The business is open from 12:00 p.m. to 2:00 a.m. daily. It employs approximately 40 people, including managers, bartenders, waitresses, and security guards. As Coe lives in another state, the managers oversee the business's daily operations.[4]

There are two private dance rooms in the back of the business, which are monitored by a security guard positioned between them. One room, the couch room, is bordered with couches where patrons may sit and view a dance for $10 to $20 per dance. The other room, referred to by the parties as the VIP room, has stalls with benches inside where patrons may sit to view dances. The stalls are shallow, which allows the adult entertainer to be seen by the security guard, but provides relative privacy to the patron. The VIP room is more expensive than the couch room because the VIP room has a five-dance, or $100, minimum.

Coe considers the adult entertainers who perform at her business to be independent contractors. Before adult entertainers may perform at the business, they must sign a

---

[3] A responsible person includes a person "who is otherwise responsible for the operation, management, direction, or policy of a police-regulated business. It also includes an employee who is in apparent charge of the premises." (§ 33.0201, italics omitted.)

[4] The parties do not dispute Coe and the managers of her business are responsible persons within the meaning of section 33.3609.

3

contract, which recites the six-foot, no-touch, and no-fondling rules. These rules are explained to them and they are shown a dance compliant with the rules. The business does not require the adult entertainers to undergo a reference check or a background check apart from the criminal background check required for an adult entertainer to obtain an adult entertainer permit from the City.

The adult entertainers set their own schedules. Between 12 to 15 adult entertainers perform on a day shift and an average of 50 adult entertainers perform on an evening shift. The adult entertainers pay a flat fee to perform and they keep any payment or tips they receive for private dances. At the end of their shift, they "tip out" by giving a percentage of their receipts to the shift manager, the disc jockey, and the doorman, which is then shared with other employees, including the security guards.

B

In 2006, the City issued a 30-day suspension to Coe for multiple violations of the six-foot and no-touch rules occurring during overt and covert inspections between September 2005 and September 2006. Coe appealed the suspension. The parties subsequently settled the matter in January 2007 with Coe admitting to no-touch violations occurring between March and September 2006 and paying a $10,000 fine.

In July 2012 the City issued a 15-day suspension to Coe for multiple violations of the six-foot, no-touch, and no-fondling rules occurring between March 2011 and April 2012. Coe appealed the suspension. The parties settled the matter in February 2013 with Coe admitting the violations, agreeing to a three-day suspension, and paying a $20,000

4

civil penalty. Coe also agreed to mandatory training, which she and the business's managers, security guards, and disc jockeys attended on March 5, 2013.

At the end of April 2013 the City sent Coe a warning letter advising her of multiple violations of the no-touch and no-fondling rules by 14 adult entertainers. The violations occurred during covert inspections in late March and April 2013, after Coe and her staff had completed the mandatory training.

In May 2013 Coe and the business's managers met with police department representatives. The parties discussed the recent violations and what measures Coe might employ to reduce their occurrence. The police representatives warned Coe the next penalty for further violations would be a 15-day suspension.

Coe took a number of steps to prevent further violations. These steps included hiring a security consultant; improving lighting; posting a security guard in the corridor between the private dance rooms; installing monitors in the private dance rooms to allow for remote observation and correction of violating conduct through an intercom system; posting the six-foot, no-touch, and no-fondling rules on the walls, in the bathrooms, and in the dressing rooms; and using secret shoppers to check for rule compliance. She also began keeping track of adult entertainers and using a progressive discipline policy against adult entertainers found violating the rules.

Nonetheless, violations continued to occur at Coe's business. In August 2013 the City sent Coe a warning letter advising her of multiple violations of the no-touch and no-fondling rules by 10 adult entertainers occurring during covert inspections in May, June and July 2013. In October 2013 the City sent Coe a warning letter advising her of

5

violations of the no-touch and no-fondling rules by one adult entertainer occurring during a covert inspection in September 2013. In February 2014 the City sent a warning letter to Coe advising her of multiple violations of the no-touch and no-fondling rules by nine adult entertainers occurring during overt and covert inspections in January and February 2014. In April 2014 the City sent Coe a warning letter advising her of multiple violations of the no-touch and no-fondling rules by three adult entertainers occurring during covert inspections in February 2014.[5]

Later in April 2014 the parties met to discuss the continuing violations. Coe expressed frustration with the delay between the violations and the receipt of the warning letters, believing the delay prevented her from adequately identifying and disciplining the adult entertainers or the security guards. In May 2014 the City sent Coe a letter recapping the meeting and indicating additional violations, depending on the severity, would most likely result in the revocation of her nude entertainment business permit.

In June 2014 the City notified Coe it was revoking her nude entertainment business permit for repeated violations of the six-foot, no-touch, and no-fondling rules.

---

[5] One sentence in one of the reports documenting the violations misnamed an adult entertainer. The report correctly named the adult entertainer in 13 other places. The error occurred because the officer who prepared the report had used another similar report as a template. The officer noted the error and corrected it two months later, before the City sent the warning letter to Coe.

The notice cited 12 violations of these rules occurring during overt and covert inspections after the parties' April 2014 meeting.[6]

Most of the conduct described in the various warning letters occurred in the private dance rooms. At least fifteen separate officers or detectives observed the conduct. Over 40 separate nude entertainers committed the violations, which included rubbing breasts against faces; grinding breasts and buttocks against groins; and rubbing groins or hands against legs, chests, or groins. Some violations occurred when no security guard was present. Others occurred when a security guard was present, but the security guard did not intervene. Still others occurred when a security guard was present and intervened, but then allowed the adult entertainer to continue with the violating conduct. Several adult entertainers said they had been advised to change their stage names often to avoid identification and notices of violation.

C

Coe administratively appealed the revocation.[7] A hearing officer conducted a four-day evidentiary hearing. At the conclusion of the hearing, the hearing officer upheld the revocation. The hearing officer found based on the above evidence the City had

[6] One of the reports documenting the violations incorrectly stated the report had been approved in March 2014 when it had actually been approved in April 2014 on the same day the reported violation occurred. The error was noted and corrected a week later.

[7] At the end of September 2014, while the administrative appeal was pending, the City sent Coe a warning letter advising her of multiple violations of the six-foot, no-touch, and no-fondling rules by 16 adult entertainers occurring during covert inspections in July and August 2014.

established: (1) the business's adult entertainers had committed numerous and continuing violations of the six-foot, no-touch, and no-fondling rules; (2) Coe was aware of these rules; (3) she negligently failed to supervise the business resulting in a pattern of violations; and (4) she demonstrated an inability to perform the duties required of a nude entertainment business permit holder. In particular, the hearing officer found that, despite numerous rules violations, Coe never disciplined any security guards for failing to properly monitor the adult entertainers. The hearing officer also found the business's compensation structure created an incentive for security guards to allow violations because the more touching that occurred, the more compensation adult entertainers were likely to receive, which increased the security guards' share of the adult entertainers' tips.

D

Coe subsequently filed a combined complaint for civil rights violations and a petition for writ of administrative mandate (petition). The petition challenged the hearing officer's decision on the grounds the decision was in excess of jurisdiction, not supported by the evidence, and not based on a fair hearing. The petition also challenged the decision on the grounds certain municipal code sections were unconstitutionally vague and overbroad.

After briefing and oral argument, the superior court denied the petition. As relevant to the issues raised in this appeal, the court found the reports prepared by the police officers and detectives who inspected the business were admissible as official records under Evidence Code section 1280. The court also found this evidence along with the other documentary and testimonial evidence presented at the hearing showed

8

numerous, continuing rules violations by the business's adult entertainers resulting from the negligent failure or inability of Coe and her staff to adequately supervise them. The court noted Coe had taken some measures to prevent violations, but these measures were ineffective and the business's staff had a monetary incentive to ignore violations. The court further found the challenged municipal code sections were not unconstitutionally vague and the delay between when the violations occurred and when the City notified Coe of them did not deprive Coe of due process of law.[8]

III

DISCUSSION

A

A petition for a writ of administrative mandate presents "the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810 (*Fukuda*).)

All of these questions, except the question of whether the findings are supported by the evidence, are questions of law, which we review de novo. (See, e.g., *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046,

---

[8]     The court entered a judgment denying the petition for writ of mandate after Coe dismissed the companion civil rights complaint.

9

1058-1059 (*JKH Enterprises*); *Gilliland v. Medical Board of California* (2001) 89 Cal.App.4th 208, 219; *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1443.) As to the question of whether the findings are supported by the evidence, the parties agree the superior court was required to exercise its independent judgment on the evidence because a decision to revoke a nude entertainment business permit involves a fundamental vested right. (Code Civ. Proc., § 1094.5, subd. (c); *JKH Enterprises*, *supra*, at p. 1057.) Under this standard, an agency abuses its discretion if the superior court determines the weight of the evidence does not support the agency's findings. (Code Civ. Proc., § 1094.5, subd. (c); *Fukuda*, *supra*, 20 Cal.4th at pp. 810-811.) In exercising its independent judgment, the superior court must accord a strong presumption of correctness to the agency's findings and the complaining party has the burden of showing the agency's decision was contrary to the weight of the evidence. (*Fukuda,* at pp. 816-817.) On appeal, we review the superior court's determination for substantial evidence. (*Id.* at p. 824.)

B

1

a

Section 33.0405, subdivision (a), provides: "Whenever regulatory action against a permittee is based on a violation of law or this Article by an employee that occurs on the premises or during the course of employment, it is sufficient to show that a responsible person caused or condoned the violation, or failed to take reasonable corrective action after timely written notice of the violation." (Italics omitted.)

10

Coe contends this section is unconstitutionally vague because the words "caused" and "condoned" are not defined and there are no standards by which to judge whether a responsible person's conduct meets this requirement. Coe similarly contends the section is unconstitutionally vague because the phrase "reasonable corrective action" is not defined and there are no standards by which to determine whether a responsible person's corrective actions are adequate.

b

Section 33.0403, subdivision (a), provides: "In addition to any other penalties provided by law, any permittee who does any of the following is subject to regulatory action by the Chief of Police against his or her police permit: [¶] … [¶] (5) Negligently fails to supervise the business resulting in a pattern of violations described by patrons, employees, or both; [¶] (6) Manifests an inability to properly perform the duties relating to the police-regulated activity as evidenced by the commission or omission of an act or series of acts." (Italics omitted.)

Coe contends these provisions are unconstitutionally vague because they do not provide sufficient guidance to police officers or responsible persons. More particularly, she contends subdivision (a)(5) requires patrons, not police officers, to describe violations, and subdivision (a)(6) lacks objective standards by which to judge Coe's conduct, resulting in police officers exercising unbridled discretion.

2

"A law is void for vagueness only if it 'fails to provide adequate notice to those who must observe its strictures' and ' "impermissibly delegates basic policy matters to

11

policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' " (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332.) "What is constitutionally required is that terms be defined with 'sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " (*Tily B., Inc. v. City of Newport Beach* (1998) 69 Cal.App.4th 1, 22.)

In evaluating vagueness claims, we consider the context of the challenged language. "A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 (*Acuna*).)

We also consider the notion of reasonable specificity or certainty. (*Acuna*, *supra*, 14 Cal.4th at p. 1117.) "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 794 [109 S.Ct. 2746, 2755, 105 L.Ed.2d 661]; *Acuna*, *supra*, at p. 1117 [" '[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions' "].) " 'All that is required is that the statute be reasonably certain so that persons of common intelligence need not guess at its meaning.' [Citations.] 'The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage

12

and understanding.' [Citation.] 'So long as the language embodies an objective concept, it is constitutionally concrete.' " (*People v. Linwood* (2003) 105 Cal.App.4th 59, 68-69; *People v. Falck* (1997) 52 Cal.App.4th 287, 294-295 [the terms of a statute need not be defined or have a precise definition; long-established or commonly accepted usage can satisfy the reasonable certainty requirement].)

3

a

Regarding the language in section 33.0405, the words "caused" and "condoned" have commonly accepted meanings. "Caused" means "a reason for an action or condition" or "something that brings about an effect or a result." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 196, col. 2.) "Condoned" means "to regard or treat (something bad or blameworthy) as acceptable, forgivable, or harmless." (*Id.* at p. 259, col. 2.) Likewise, the phrase "reasonable corrective action" is composed of words with commonly accepted meanings. "Reasonable" means "being in accordance with reason," "not extreme or excessive," and "possessing sound judgment." (*Id.* at p. 1037, col. 1.) "Corrective" means "intended to correct." (*Id.* at p. 280, col. 2.) "Action" means "a thing done." (*Id.* at p. 12, col. 2.)

"[I]ndividually and collectively these words are understandable by persons of ordinary intelligence." (*People v. Linwood, supra*, 105 Cal.App.4th at p. 69.) As used in section 33.0405, and considered in the context of the City's nude entertainment business permitting scheme, these words inform permit holders with the requisite reasonable specificity or certainty that they will be held accountable for violations they personally

13

bring about, accept and allow to continue, or fail to take practical, sensible steps to correct. We, therefore, conclude section 33.0405 is not unconstitutionally vague.

b

Subdivisions (a)(5) and (a)(6) of section 33.0403 also use ordinary words whose common usage and understanding allow them to be interpreted with reasonable certainty in the context of the City's nude entertainment business permitting scheme. Subdivision (a)(5) informs permit holders their permits are subject to regulatory action if they negligently supervise their business in a manner that results in a pattern of violations described by employees or patrons, which in this case included undercover police officers paying for private dances. Subdivision (a)(6) similarly informs permit holders their permits are subject to regulatory action if their actions demonstrate an inability to properly perform their duties as permittees. Both subdivisions preclude arbitrary, unbridled enforcement by predicating regulatory action on the occurrence and identification of specific acts establishing either negligent supervision or an inability to perform permittee duties. Accordingly, we conclude section 33.0403 is also not unconstitutionally vague.

C

Coe next contends the City's practice of accumulating violations before notifying her of them denied her due process and a reasonable opportunity to take corrective action. "Due process requires that when the government seeks to deprive a person of property, it must provide the individual with notice and an opportunity to be heard. [Citation.] When an individual claims governmental delay in imposing sanctions has violated the

14

guarantee of due process, the individual bears the burden of establishing actual prejudice." (*Krontz v. City of San Diego* (2006) 136 Cal.App.4th 1126, 1141 (*Krontz*).)

In this case, the City admitted it purposefully delayed in sending Coe warning letters to protect the identity of its undercover officers. However, the City's decision to revoke Coe's permit was not based on a discrete violation, but on a persistent pattern of violations over an extended time period. (*Krontz*, *supra*, 136 Cal.App.4th at p. 1141.) Coe had ample notice of the violations because the City sent her multiple warning letters detailing them. Police detectives also met with Coe, her attorney, and the managers of her business to discuss the violations and provide training to help Coe and the managers recognize and prevent the infringing conduct. Notwithstanding these efforts, additional violations continued to occur—some in close proximity to the meetings, some during overt inspections by police detectives, and some in the midst of the revocation proceedings (see fn. 7, *ante*). As the revocation of Coe's permit was based on a persistent pattern of violations rather than the existence of any single violation, Coe has not established the delayed warning letters actually prejudiced her and, therefore, has not established the City deprived her of due process of law.

Coe's reliance on *Walsh v. Kirby* (1974) 13 Cal.3d 95 (*Walsh*) and its progeny is misplaced. In *Walsh*, the Department of Alcoholic Beverage Control determined a retailer had violated a fair trade statute by selling alcohol at less than the minimum retail price. (*Id.* at pp. 97-98.) The retailer had no record of prior violations. (*Id.* at p. 98.) The penalty for a violation was $250 for the first offense, and $1,000 for each subsequent offense. (*Id.* at p. 98, fn. 4.) The purpose of the penalty scheme was to compel

15

compliance with the statute, not to punish or eliminate a defaulting licensee by imposing an insurmountable financial burden. (*Id.* at p. 102.) Rather than notify the retailer of the first violation and allow the retailer an opportunity to comply with the statute, the agency accumulated evidence of recurring violations and, in a single prosecution, assessed cumulative penalties. (*Id.* at pp. 98-99, 103-104.) The California Supreme Court concluded the agency acted arbitrarily and violated the retailer's due process by proceeding against the retailer in a manner not intended to induce compliance with the statute, but to impose excessive penalties resulting in a de facto revocation of the retailer's license. (*Id.* at pp. 98, 104-106 & fn. 13.)

Here, the record does not show the City accumulated violations against Coe in order to impose a more stringent penalty. Rather, the record shows the City repeatedly warned Coe of the violations occurring at her business and of her need to take corrective action. It also provided training to her and the managers of her business to help them prevent violations from occurring. The City did not attempt to revoke Coe's permit until it noted continuing violations at the business despite the City's warnings and efforts to assist her. The *Walsh* case expressly did not apply to such situations. (*Walsh*, *supra*, 13 Cal.3d at p. 105, fn. 14 ["We do not express any view whether departmental conduct similar to that in the instant case would be arbitrary if exercised against a licensee who, the record would show, was [a] habitual offender and unwilling to conform"].)

16

## D

### 1

Coe additionally contends the decision to revoke her permit was based entirely on hearsay evidence, specifically the reports of the police officers and detectives who overtly and covertly inspected Coe's business. The City counters the reports fall within the official records exception to the hearsay rule in Evidence Code section 1280 and, even if this exception does not apply to the reports, hearsay evidence is admissible in administrative proceedings.

The superior court agreed with the City, ruling the reports were admissible under the official records exception and, regardless, the reports were not the sole evidentiary basis for the City's decision to revoke Coe's permit. We review the court's ruling for abuse of discretion and we may not overturn the ruling except upon a clear showing of abuse. (*People v. Martinez* (2000) 22 Cal.4th 106, 119-120; *Glatman v. Valverde* (2006) 146 Cal.App.4th 700, 703 & fn. 2.)

### 2

The official records exception to the hearsay rule provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Evid. Code, § 1280.)

17

Coe contends the official records exception does not apply to the reports of the police officers and detectives who inspected her business because the reports were not prepared at or near the time of the observed violations. She also contends the method and timing of the reports' preparation do not indicate trustworthiness.

a

Regarding the timeliness requirement, this "requirement 'is not to be judged … by arbitrary or artificial time limits, measured by hours or days or even weeks.' [Citation.] Rather, 'account must be taken of practical considerations,' including 'the nature of the information recorded' and 'the immutable reliability of the sources from which [the information was] drawn.' [Citation.] 'Whether an entry made subsequent to the transaction has been made within a sufficient time to render it within the [hearsay] exception depends upon whether the time span between the transaction and the entry was so great as to suggest a danger of inaccuracy by lapse of memory.' " (*People v. Martinez*, *supra*, 22 Cal.4th at p. 128; *Miyamoto v. Department of Motor Vehicles* (2009) 176 Cal.App.4th 1210, 1219.)

Coe contends the timeliness requirement was not met because some of the reports were not prepared until several days to a week after the incident, which created a danger of inaccuracy from memory lapse. In support of this contention, she points to the reports with admitted inaccuracies, including the report misnaming of an adult entertainer. (See fn. 5, *ante*.)

However, the record includes multiple warning letters supported by over 40 reports. A custodian of records for the police department's vice unit testified the officers

18

and detectives who inspected Coe's business normally prepared their reports immediately at the end of the shifts in which they witnessed violations. Sometimes, depending on what other operations were occurring, they prepared their reports the next morning. If an officer or detective had a day off, the preparation of the report might have been delayed by a few days. The timing of the overwhelming majority of the reports appears consistent with the normal practice of preparing reports at the end of a shift or the next morning. Only a small number of reports appear to have actual or possible delays of more than a day in their preparation. Of those reports which were actually or possibly delayed, most are sufficiently detailed to dispel any suggestion of inaccuracy from memory lapse. Thus, the overwhelming majority of the reports meet the timeliness requirement for application of the official records exception.

b

Regarding the trustworthiness requirement, a police report normally satisfies this requirement when, as here, it is based on the reporting officer's firsthand observations. (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 430; *McNary v. Department of Motor Vehicles* (1996) 45 Cal.App.4th 688, 695; *Snelgrove v. Department of Motor Vehicles* (1987) 194 Cal.App.3d 1364, 1375.) Although Coe contends the method of preparation was suspect to the extent the officers and detectives used past reports as templates, she identifies only a few reports containing errors attributable to this method and only one error she characterizes as critical, which the City noted and corrected on its own. (See fn. 5, *ante*.) Given the number of reports in the record, the few errors identified by Coe do not establish the method of preparation rendered the reports inherently untrustworthy.

19

Accordingly, the trial court correctly determined the overwhelming majority of reports were admissible as official records.

c

To the extent a few reports may not have met the requirements for the official records exception to apply to them, their admission was nonetheless proper. San Diego Administrative Regulation No. 10.10, section 4.3, subdivision (a), provides an administrative hearing "need not be conducted according to the technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions." (San Diego Admin. Reg. No. 10.10, § 4.3, subd. (a); accord, Gov. Code, § 11513, subd. (c).)

The regulation further provides an administrative hearing officer "may consider hearsay evidence as part of [his or her] determination except that no finding may be based solely on such hearsay evidence unless the hearsay evidence is supportive or supplementary to other legally competent evidence. Hearsay may be used if it would be admissible in a civil action." (San Diego Admin. Reg. No. 10.10, § 4.3, subd. (c); accord, Gov. Code, § 11513, subd. (d).)

Here, in addition to the admission of the reports qualifying as official records, seven of the 15 officers and detectives who prepared reports and observed violations at Coe's business testified to their observations at the administrative hearing. Since the few reports that may not have qualified as official records supported or supplemented this

20

evidence, they were properly considered and relied upon. (See, e.g., *Komizu v. Gourley* (2002) 103 Cal.App.4th 1001, 1007.)

E

Coe further contends the finding she caused or condoned violations by entertainers was not supported by the evidence and ignored the corrective actions she took to prevent violations. We disagree.

The testimonial and documentary evidence showed a clear pattern of ongoing, blatant violations of the six-foot, no-touch, and no-fondling rules at Coe's business. Although Coe had taken some measures to prevent violations, she did not take other potentially more effective measures, including assigning an additional security guard to monitor the private dance areas and reprimanding security guards, when appropriate, for neglecting their duties. In addition, because Coe's employees received a percentage of the money each adult entertainer earned from private dances, they had a financial incentive to ignore rules violations. Indeed, there was evidence Coe's employees had instructed the adult entertainers to change stage names frequently to hinder the detection of rules violations. As another court in an analogous context aptly observed, when violations "occur with alarming regularity, it is naive to suppose that these conditions of the establishment prevailed without the permission and consent of the licensee." (*Harris v. Alcoholic Beverage Control Appeals Board* (1963) 212 Cal.App.2d 106, 119.)

F

Finally, Coe contends the City abused its discretion in deciding to revoke her permit because the decision was based on a vague "totality of the circumstances" standard

rather than objective standards. "[W]e review de novo whether the agency's imposition of a particular penalty on the petitioner constituted an abuse of discretion by the agency. [Citations.] But we will not disturb the agency's choice of penalty absent ' "an arbitrary, capricious or patently abusive exercise of discretion" ' by the administrative agency." (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627-628.)

The San Diego Municipal Code allows revocation of a nude entertainment business permit as one means of enforcing the rules applicable to nude entertainment businesses. (§ 33.0401, subd. (a) ["Regulatory provisions are enforceable through the issuance, denial, suspension, placing conditions upon, or revocation of the permit, and through the issuance of verbal or written warnings, and notices of violation"], italics omitted.) A nude entertainment business permit may be constitutionally revoked when the permit holder has violated valid provisions of the permitting scheme. (*Krontz, supra*, 136 Cal.App.4th at p. 1134.)

" 'In reviewing the severity of the discipline imposed, we look to the correctness of the agency's decision rather than that of the trial court.' [Citation.] ' "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. [Citations.] *Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.* [Citation.]" [Citation.] [¶] "In reviewing the exercise of this discretion we bear in mind the principle 'courts should let administrative boards and officers work out their problems with as little judicial interference as possible … . Such boards are vested with a high discretion and its abuse

22

must appear very clearly before the courts will interfere.' " ' [Citation.] 'The policy consideration underlying such allocation of authority is the expertise of the administrative agency in determining penalty questions.' " (*Cassidy v. California Bd. of Accountancy*, *supra*, 220 Cal.App.4th at p. 633.)

Here, the City decided to revoke Coe's permit, instead of imposing the lesser penalty of a 15-day suspension, based on the totality of the circumstances occurring after the February 2013 settlement agreement and resulting three-day suspension. These circumstances include the warning letters sent to Coe; the number, frequency and severity of the violations occurring at her business; the meetings with Coe and her staff to ameliorate the violations; and the ineffectiveness of the corrective actions taken by her and her staff. These circumstances also necessarily include the evidence indicating Coe's employees had attempted to hinder the detection of rules violations by advising or requiring adult entertainers to change their stage names frequently. Under these circumstances, the City could have reasonably concluded the lesser penalty of a 15-day suspension would not have ameliorated the pattern of ongoing rules violations. Consequently, we cannot conclude the City abused its discretion by acting arbitrarily and capriciously in choosing revocation, rather than a 15-day suspension as the appropriate penalty for the rules violations at Coe's business.

IV

DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.


McCONNELL, P. J.

WE CONCUR:


IRION, J.


PRAGER, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.