Filed 1/16/26; Certified for Publication 2/13/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANAHEIM POLICE DEPARTMENT, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JOHN ADAMS CROCKETT, JR., <br><br> Defendant and Appellant. | G063347 <br><br> (Super. Ct. No. 30-2023-01303601) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Glenn Mondo, Temporary Judge. (Pursuant to Cal. Const., art VI, § 21.) Affirmed.

The Law Offices of John D. Rogers, John D. Rogers; The Law Offices of Jonathan Reza and Jonathan K. Reza for Defendant and Appellant.

Robert Fabela, City Attorney, and Sunny Huynh, Deputy City Attorney, for Plaintiff and Respondent.

In 2023, the Anaheim Police Department requested a Gun Violence Restraining Order (GVRO) (Pen. Code, § 18175),[1] against appellant John Adams Crockett, Jr. after Crockett's son Tyler Crockett sent text messages threatening a mass shooting at a local high school. Tyler is an adult who lives with his father.[2]

The trial court granted the GVRO, concluding Crockett's failure to adequately secure his firearms and ammunition, together with Tyler's documented history of mental health issues and threat of mass violence, posed a substantial risk of injury to others. The court further determined the GVRO was necessary to prevent harm and there were no adequate but less restrictive alternatives.

Crockett appeals the trial court's grant of the GVRO on the following grounds: (1) the evidence adduced at the hearing was insufficient to grant the GVRO; (2) the trial court erred in interpreting section 18175's definition of "cause" and section 18175 is so vague as to violate Crockett's right to due process; (3) the court failed to properly consider less restrictive alternatives; (4) the application of section 18175 to Crockett violates his Second Amendment right to bear arms; (5) section 18175 is overbroad; and (6) the trial court erred in relying upon inadmissible hearsay in granting the GVRO.

We conclude the trial court properly granted the GVRO and affirm the court's order.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Since father and son share the same last name, we refer to Tyler by his first name. No disrespect is intended.

FACTS

On January 26, 2023, the Anaheim Police Department obtained a temporary GVRO against Crockett. After multiple continuances, an evidentiary hearing was held on October 9, 2023. Crockett and Anaheim Police Department Investigator Robert Reams both testified at the hearing and were subject to cross-examination by counsel.

A.     *Investigator Reams's Testimony*

Reams was assigned to the Orange County School Mobile Assessment and Resource Team, a unit responsible for assessing threats of violence to schools. On January 23, 2023, Reams responded to a call for assistance regarding text message threats sent by Tyler, which targeted Savanna High School in Anaheim, California, and mentioned large amounts of ammunition. Although the actual text message is not a part of the appellate record, the firearms emergency protective order provides the following information: "It was reported Tyler Crockett made threats on social media direct messages that he was going to shoot up the school. . . . In the messages, Tyler made reference to making a demand for he and John having their case heard in front of a family court judge or 'we start shooting people.' He said 'Savanna High School is the target. We have thousands of rounds of ammunition.'"

After checking the Department of Justice's firearms registry, Reams learned Crockett owned multiple guns. Reams interviewed Crockett, who was aware of the text message, but expressed surprise regarding the threat to the high school because he believed Tyler's frustration was related to issues with a female acquaintance. Crockett informed Reams that Tyler had training in long-range shooting; he and Tyler belonged to two gun clubs; and they also engaged in recreational shooting.

Crockett told Reams that Tyler had been placed on three separate involuntary holds for mental health crises. The most recent incident occurred about eight years earlier. Crockett also told Reams that Tyler suffered from post-traumatic stress disorder (PTSD) and depression. Tyler attempted suicide in the past. Reams discovered from a records check that Tyler had a lifetime prohibition on purchasing, owning, or possessing firearms as a result of the involuntary mental health holds.

When Reams interviewed Tyler, he admitted sending the threatening message and explained his frustration stemmed from a former female classmate with whom he had attended Savanna High School 10 years before. Reams testified Tyler told him, "given the opportunity, that if he were to go to the high school, other people would die."

Based on Tyler's statements, mental health history, recreational gun use, and potential access to guns located at Crockett's home, Reams believed Tyler probably had access to weapons and would carry out his threatened attack at Savanna High School if given the opportunity. Consequently, Reams sought a temporary GVRO against Crockett, which was granted by the trial court. The emergency order listed 10 firearms Reams had reasonable cause to believe were in Crockett's possession. Reams served a copy of the temporary GVRO on Crockett and informed him he needed to turn in all of his guns and ammunition within 24 hours.

The following day, Crockett turned in numerous items to the Anaheim Police Department and stated in writing under penalty of perjury he did not have or own any other firearms, firearm parts, ammunition, or magazines. However, Reams later learned Crockett had not turned in all of his firearms. Crockett told Reams's partner that seven of his firearms had been melted down and he had sold another firearm to a third party.

4

Additionally, Crockett had only turned in component parts of certain rifles, not the entire rifle, which, in Reams's opinion, did not comply with the terms of the temporary GVRO. Reams therefore concluded there were likely other firearms which Crockett had not relinquished.

As a result, Reams obtained a search warrant for Crockett's home and car. During the search of the home, Reams discovered multiple component parts of firearms, ammunition, high-capacity magazines, and component parts and tools for manufacturing ammunition. A .45-caliber magazine was also found in Crockett's vehicle. Tyler told Reams he had previously known the code to access the main gun safe in the home but had asked his father to change the code after the imposition of the firearms ban in connection with his mental health holds. Reams also located a separate wall-mounted gun safe in Crockett's home; although the safe was locked, the key fob to unlock it was found on the mantel directly below the safe. Reams used the key fob to open the gun safe and discovered an empty foam cutout for an AR-15 style rifle. Crockett's roommate had seen a firearm inside the gun safe in the past.

Crockett told Reams he was not involved in drafting or sending the threatening text message and he believed Tyler was only prohibited from owning guns for five years after Tyler's last involuntary mental health hold in 2015.

B.    *Crockett's Testimony*

Crockett was unaware Tyler had a lifetime ban on possessing firearms or ammunition, as opposed to a five-year ban. The key fob for the wall-mounted gun safe was usually stored securely. It was only on the mantel below the gun safe when the police executed the search warrant because he had been "in a hurry to get my guns to the police station." He did not believe

5

there had been an AR-15 in the wall-mounted safe within the six months before the search warrant was executed. Crockett owned approximately 6,000 rounds of ammunition. Crockett intended to turn all his ammunition in to the police but left some behind. The police refused to let him return to his home to retrieve the rest of his ammunition because they were searching his home pursuant to the search warrant.

Crockett practiced safe firearm storage and handling. He had never been convicted of a crime or served with a permanent restraining order. He had not threatened any violence against himself or others. Crockett has a top security clearance for his job as a mechanical engineer, which requires him to comply with all laws, including those related to gun ownership.

After Tyler's mental health hold in 2015, Crockett read the Welfare and Institutions Code to determine whether Tyler was allowed to possess a firearm. He conducted internet searches to keep up with the changing California firearms laws. Crockett was unaware Tyler was subject to a lifetime ban from owning or possessing a firearm under federal law. He would never knowingly provide a firearm to a prohibited person. Now that he was aware Tyler was subject to a lifetime ban, he would never give Tyler access to his firearms.

Crockett and Tyler competed in approximately eight shooting competitions with bolt-action rifles in 2022. He never let the firearms out of his sight at the competitions. At the time of these competitions, Crockett did not believe Tyler was prohibited from possessing firearms, or that he posed a danger to himself or others at these competitions. Aside from shooting competitions, Crockett allowed Tyler to use a firearm at a shooting range.

Before learning Tyler had made threats to Savanna High School, Crockett had no concerns Tyler would make threats to others or to a school. After Tyler's mental health hold in 2015, he no longer had the code to Crockett's main gun safe.

Crockett was unable to turn in all the firearms listed on the emergency protective order because he had transferred one of the firearms to another party. Additionally, he had destroyed seven other plastic firearms when he learned they were no longer legal under California law. Crockett was unaware that, when a registered firearm is destroyed, California law requires the owner to submit a form notifying the state the owner is no longer in possession of the firearm. Crockett was unsure whether the firearms he destroyed were still registered under his name.

C.    *Trial Court's Order*

The court found it was undisputed that Tyler, who lived with Crockett, had a history of multiple mental health holds, was subject to a lifetime firearms prohibition, suffered from PTSD and depression, made credible threats to commit a mass shooting at a high school, and had confirmed to police his intent to harm students at the high school if he had access to a gun. The court also found it was undisputed that Crockett possessed "many, many firearms and a great deal of ammunition" before the emergency protective order was served on him. The court found not credible Crockett's testimony that no firearms were kept in the wall-mounted safe within the last six months and he had only left the key fob for the safe on the mantel on the single occasion when the police were searching the house. The court also found not credible Crockett's testimony that, after delivering his ammunition to the police station, he intended to return to his home to conduct a second search for any ammunition he may have missed.

7

The court did not believe Crockett "personally poses a threat of harm to himself or others as a potential shooter." Nor did the court believe Crockett purposefully failed to comply with the terms of the restraining order. However, the court concluded Crockett "unfortunately, made a terrible mistake, a terrible decision in being his own lawyer regarding restrictions on his son's access to firearms. There's no question that [Crockett] provided access to firearms to a person who was subject to a lifetime prohibition. That could easily result in a tragedy, quite honestly, given the son's situation."

The court concluded Crockett's "conduct, a pattern of failing to secure weapons, allowing his troubled son access to weapons despite a lifetime prohibition, and, frankly, his allowing such acts [while] knowing of his son's mental health history all posed a significant danger of causing injury to another by having weapons in his custody or control."

The court found by clear and convincing evidence that Crockett posed a significant danger of causing personal injury to another by possessing firearms and ammunition. The court concluded Crockett failed to properly secure his guns and ammunition from his son Tyler, who suffered mental health issues, had a lifetime ban on possessing firearms, and had threatened to commit a school shooting. The court emphasized Crockett acted recklessly in allowing Tyler access to firearms, particularly because Tyler lived with him and the key fob to the wall-mounted gun safe was found on the mantel under the safe during a search of Crockett's home. Based on these facts, the trial court issued a three-year GVRO against Crockett.

8

## DISCUSSION

## I.

## LEGAL STANDARD

### A.   *The GVRO Statute*

A court may grant a GVRO for a duration of one to five years after notice and hearing if it finds "by clear and convincing evidence" there is a "significant danger" of gun violence. (§ 18175.) A court may issue a GVRO if sworn affidavits or testimony and "any additional information provided to the court shows that there is a substantial likelihood that both of the following are true: [¶] (1) The subject of the petition poses a significant danger, in the near future, of causing personal injury to the subject of the petition or another by having in their custody or control, owning, purchasing, possessing, or receiving a firearm . . . . [¶] (2) [A GVRO] is necessary to prevent personal injury to the subject of the petition or another because less restrictive alternatives either have been tried and found to be ineffective, or are inadequate or inappropriate for the circumstances of the subject of the petition." (§ 18150, subd. (b)(1)(2).)

As relevant here, one of the factors the court must consider is whether there has been "[a] recent threat of violence or act of violence by the subject of the petition directed toward another individual, group, or location." (§ 18155, subd. (b)(1)(A); see § 18175, subd. (a).)

### B.   *Standard of Review*

A trial court's factual findings on the elements necessary for a GVRO are reviewed for substantial evidence (*Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 323), bearing in mind the clear and convincing evidence standard of proof (§ 18175, subd. (b); *Rafat*, at p. 323). "Clear and convincing evidence requires a finding of high probability."

9

(*San Diego Police Dept. v. Geoffrey S.* (2022) 86 Cal.App.5th 550, 576 (*Geoffrey S.*).) Thus, "the evidence must be so clear as to leave no substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind." (*Ibid.*) "'When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.'" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) We "view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011–1012.)

## II.

### THE TRIAL COURT'S DECISION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

Crockett contends substantial evidence does not support the trial court's grant of the GVRO. In particular, Crockett argues there was no evidence to demonstrate he himself committed any of the acts listed in section 18155, subdivision (b).

There was substantial evidence that Crockett's son Tyler posed a threat of physical violence based upon his history of mental health issues, including three Welfare and Institutions Code psychiatric holds, which led to a lifetime ban on possessing firearms or ammunition. Additionally, Tyler admitted having made threats via text to commit a shooting at Savanna High School if he were to obtain a firearm. Crockett did not adequately secure his firearms from Tyler, who lived with him. The key fob to the wall-mounted gun safe was found on the mantel beneath the gun safe. Crockett did not timely turn in all his firearms and ammunition. He also let Tyler handle

10

firearms at shooting competitions and gun ranges in 2022, despite Tyler's lifetime ban on possessing firearms.

That Crockett himself did not directly pose a "significant danger" of committing gun violence does not mean he could not be subject to a GVRO. The Anaheim Police Department showed by clear and convincing evidence Crockett could not adequately prevent his son from accessing his firearms, and his son did pose a significant threat of gun violence. The GVRO statute would be ineffectual if the ban could not be applied to those, like Crockett, who enable, however unintentionally, the threat of violence by others. Accordingly, viewing the evidence in the light most favorable to the trial court's decision, we conclude the court properly granted the GVRO.

## III.

### THE TRIAL COURT'S INTERPRETATION OF THE WORD "CAUSE" IN SECTION 18175 WAS REASONABLE, AND THE STATUTE IS NOT UNCONSTITUTIONALLY VAGUE

The GVRO statute requires the government to prove, "by clear and convincing evidence," that "[t]he subject of the petition . . . poses a significant danger of *causing* personal injury to themselves or another by having in the subject's or person's custody or control, owning, purchasing, possessing, or receiving a firearm, ammunition, or magazine." (§ 18175, subd. (b)(1), italics added.) Crockett argues the trial court erred in interpreting the word "causing" to include conduct that does no more than pose a significant danger of causing personal injury to another person. Crockett relies on *People v. Cervantes* (2001) 26 Cal.4th 860, 874, which found the defendant's provocative actions were not a proximate cause of a string of ensuing events which eventually led to a gang shooting by unrelated third parties.

11

Crockett fails to explain how *Cervantes*, a criminal case, relates to the issue of causation in this civil restraining order matter. First, unlike criminal statutes, the GVRO statute does not require proof of proximate cause for a specific injury. (§ 18175.) Rather, it is a forward-looking statute, which assesses whether an individual's current possession of firearms poses a significant danger of personal injury to himself or to another in the future and seeks to prevent that harm. (*Id.*, subd. (b)(1).) Second, even if proximate causation were an element of the GVRO statute, the causal connection between Crockett's failure to properly secure his firearms from his son and Tyler's ability to gain possession of those firearms to commit gun violence is not attenuated as it was in *Cervantes*. Here, the danger arises, not from the actions of unrelated third parties as in *Cervantes*, but from Crockett's own conduct, including failure to safely secure his firearms from Tyler, failure to educate himself about the scope of Tyler's firearms ban, and failure to fully comply with the emergency GVRO's requirement that he turn in *all firearms and ammunition*. Accordingly, the trial court reasonably interpreted the word "causing" to include Crockett's actions in failing to secure his guns and ammunition.

Additionally, Crockett argues the statute is unconstitutionally vague because the word "causing" is undefined and thus lacks standards for evaluating whether a reasonable person's conduct violates the statute. In support of this argument, Crockett points to the trial court's uncertainty whether the word "causing" applied to Crockett when the threat of potential gun violence arose from his son Tyler's conduct. Our review of the statute demonstrates it is not unconstitutionally vague.

"A law is void for vagueness only if it 'fails to provide adequate notice to those who must observe its strictures' and "'impermissibly delegates

12

basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."'" (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332.) "What is constitutionally required is that terms be defined with 'sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" (*Tily B., Inc. v. City of Newport Beach* (1998) 69 Cal.App.4th 1, 22.)

In evaluating vagueness claims, we consider the context of the challenged language. "A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness." (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 (*Acuna*).)

We also consider the notion of reasonable specificity or certainty. (*Acuna, supra*, 14 Cal.4th at p. 1117.) "'All that is required is that the statute be reasonably certain so that persons of common intelligence need not guess at its meaning.' [Citations.] 'The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.' [Citation.] 'So long as the language embodies an objective concept, it is constitutionally concrete.'" (*People v. Linwood* (2003) 105 Cal.App.4th 59, 68–69 (*Linwood*).)

Here, the word "causing" has a commonly accepted meaning. "'Caused' means 'a reason for an action or condition' or 'something that brings about an effect or a result.' [Citation.]." (*Coe v. City of San Diego* (2016) 3 Cal.App.5th 772, 783–784 (*Coe*).) Thus, the word "causing" would be commonly understood to mean that Crockett's act of possessing firearms and ammunition "br[ought] about the effect or result" of personal injury to

13

himself or another. The fact Crockett himself was not likely to directly cause the personal injury does not make the word "causing" vague. Rather, Crockett's failure to adequately prevent his son Tyler, who was subject to a lifetime ban and had credibly threatened violence against a school, from accessing and using his guns, could reasonably "cause" injury.

The word "causing" is "understandable by persons of ordinary intelligence." (*Linwood*, *supra*, 105 Cal.App.4th at p. 69; see *Coe, supra*, 3 Cal.App.5th at pp. 783–784 [city ordinance authorizing regulatory action against a strip club upon showing a responsible person "caused or condoned" a violation of restrictions on proximity and touching was not vague because the words "caused and condoned" were understood by "'persons of ordinary intelligence'"].) Here, as used in section 18175, and considered in the context of the GVRO statute's legislative purpose in preventing gun violence, the word "causing" adequately informs gun owners their firearms will be seized if they "bring[] about an effect or a result" of potential personal injury to themselves or others. (*Coe, supra,* at p. 784.)

The fact the trial court acknowledged this case did not involve the typical situation where the person subject to the firearm prohibition was likely to cause the risk of personal injury himself does not, without more, make the statute unconstitutionally vague. The court engaged in reasonable statutory interpretation in concluding the GVRO statute also applied to individuals like Crockett, whose failure to adequately secure his firearms enabled his son Tyler to cause potential harm to others.

14

## IV.

### THE TRIAL COURT PROPERLY CONSIDERED REASONABLE ALTERNATIVES

Crockett contends the trial court failed to properly evaluate less restrictive alternatives, such as using a gun safe, storing his firearms offsite, or requiring Tyler to move out of Crockett's home. We disagree.

The GVRO statute requires the court to evaluate whether a gun violence restraining order is necessary to prevent personal injury "because less restrictive alternatives either have been tried and found to be ineffective, or are inadequate or inappropriate for the circumstances of the subject of the petition." (§ 18175, subd. (b)(2).) The trial court noted its obligation under the GVRO statute to consider less restrictive alternatives but concluded any alternatives were "inappropriate for the circumstances." The court did not explicitly identify on the record any less restrictive alternatives.

Crockett fails to cite any authority which requires the trial court to specifically list, on the record, every possible alternative before concluding these alternatives would be inappropriate under the particular circumstances. Moreover, Crockett, who was represented by counsel at the GVRO hearing, could have suggested other possible alternatives to the court, but failed to do so.

Giving due deference to the trier of fact's evaluation of the evidence adduced at the hearing, the court could reasonably have concluded there were no less restrictive alternatives available which would be effective in preventing gun violence. Crockett had failed to adequately safeguard his firearms from Tyler and to timely turn over all his guns and ammunition to the police. Crockett also allowed Tyler to use Crockett's firearms in shooting competitions and at the gun range, despite Tyler's lifetime firearm ban. Thus,

15

the trial court did not abuse its discretion in concluding any other less restrictive alternatives would not be appropriate under these circumstances.

## V.

### CROCKETT'S SECOND AMENDMENT ARGUMENT IS FORFEITED

Crockett argues the GVRO statute, as applied to him, violated his right to bear arms under the Second Amendment to the United States Constitution. Because Crockett failed to raise this issue in the trial court and raises it for the first time on appeal, he has forfeited any claim of error. (*Geoffrey S.*, *supra*, 86 Cal.App.5th at p. 567 [as-applied Second Amendment claim based on seizure of firearms pursuant to a GVRO forfeited for failure to raise claim in the trial court].) As-applied challenges, which require an analysis of the specific facts of the case, must be timely asserted in the trial court. (*In re Sheena K.* (2007) 40 Cal.4th 875, 880–881.)

## VI.

### THE OVERBREADTH DOCTRINE IS INAPPLICABLE

Crockett argues the GVRO statutes are unconstitutionally overbroad in the reach and extent of persons they may restrain. However, the overbreadth doctrine applies only to laws that infringe speech or conduct protected by the First Amendment to the United States Constitution. We note all the cases cited by Crockett regarding the overbreadth doctrine were brought as First Amendment, not Second Amendment, challenges. The Supreme Court "ha[s] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (*United States v. Salerno* (1987) 481 U.S. 739, 745; see *Regina v. State of California* (2023) 89 Cal.App.5th 386, 402 [collecting cases in which courts have declined to apply the overbreadth doctrine to Second Amendment challenges].) Accordingly, we conclude Crockett's overbreadth claim is without merit.

16

## VII.

### CROCKETT'S HEARSAY ARGUMENT IS FORFEITED

Finally, Crockett argues the trial court erred in admitting and relying upon hearsay evidence in issuing the GVRO. Because Crockett failed to raise this issue in the trial court, he has forfeited any claim of error. An objection to the admission of evidence must be "timely made" and address the "specific ground of the objection" in order to preserve the issue for appeal. (Evid. Code, § 353, subd. (a); *People v. Bolin* (1998) 18 Cal.4th 297, 320 [failure to raise hearsay objection during trial waived issue].)

Crockett also raises a related claim that admission of this hearsay evidence violated his right to confront witnesses under the Sixth Amendment to the United States Constitution. However, he did not raise an objection on Sixth Amendment grounds below and has also forfeited this claim. (*People v. Redd* (2010) 48 Cal.4th 691, 730 [hearsay objection alone does not preserve a claim under the confrontation clause].)

DISPOSITION

The trial court's order is affirmed. Respondent is entitled to recover its costs on appeal.


BANCROFT, J.*

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANAHEIM POLICE DEPARTMENT,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOHN ADAMS CROCKETT, JR.<br><br>Defendant and Appellant. | G063347<br><br>(Super. Ct. No. 30-2023-01303601)<br><br>O R D E R |

This court is in receipt of requests for publication of our opinion filed January 16, 2026, from: (1) Respondent City of Anaheim; (2) Pasadena City Attorney/City Prosecutor's Office; (3) the City Attorney of the City of San Diego; and (4) the City Attorney of the City of San Jose.

It appears the opinion meets the standards for an opinion to be certified for publication as set forth in California Rules of Court, rule 8.1105(c)(2), (4), and (6).

The requests for publication are GRANTED. The opinion is ordered published in the Official Reports.


BANCROFT, J.*



WE CONCUR:



MOORE, ACTING P. J.



SCOTT, J.



*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2